UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DOMESTIC VIOLENCE SURVIVORS
SUPPORT GROUP, INC., d/b/a
DOMESTIC VIOLENCE COUNSELING
CENTER, and ELIZABETH CRAWFORD,

     Plaintiffs,

v.                                        Civil Action No. 2:18-cv-00452

BILL E. CROUCH, in his official
Capacity as Secretary of the West
Virginia Department of Health and Human
Resources; PATRICIA BAILEY, individually
and in her official capacity as Chairperson
of the Family Protection Services Board, an
entity of the West Virginia Department of
Health and Human Resources; WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN RESOURCES;
THE FAMILY PROTECTION SERVICES BOARD; and
WEST VIRGINIA COALITION AGAINST DOMESTIC
VIOLENCE, INC.,

     Defendants.

MEMORANDUM OPINION AND ORDER

Pending are three motions to dismiss: the motion by

Patricia Bailey, filed May 15, 2018 (ECF No. 24); the motion by

Bill E. Crouch, the Family Protection Services Board (the

"Board"), and the West Virginia Department of Health and Human

Services ("DHHR"), filed May 15, 2018 (ECF No. 26); and the

motion by the West Virginia Coalition Against Domestic Violence,

Inc. (the "Coalition"), filed May 25, 2018 (ECF No. 31).

I.   Background

Plaintiff Elizabeth Crawford is an African-American woman who founded and serves as the executive director of plaintiff Domestic Violence Survivors Support Group, Inc., a West Virginia non-profit corporation doing business as the Domestic Violence Counseling Center ("DVCC").  ECF No. 1 ¶¶ 1–2.  DVCC provides counseling, education, and prevention services and seminars to domestic violence victims[1] and offenders, with an emphasis on providing services to the African-American community.  See id. ¶¶ 3–4.  DVCC also provides these services to victims of other crimes or traumatic events.  See id.

DHHR is an executive department of the State of West Virginia.  See Executive Reorganization Act, ch. 3, 1989 W. Va. Acts Extraordinary Sess. 1735, 1738.  Defendant Bill E. Crouch, who is sued only in his official capacity, is currently the Secretary of DHHR.  See ECF No. 1 at ¶ 5.  The Board is a public body under the umbrella of DHHR that oversees the licensing of domestic violence programs in West Virginia.  See W. Va. Code § 48-26-401(b); Men & Women Against Discrimination v. Family

---

[1] The court acknowledges that there are different preferences for the term to describe individuals who experienced domestic violence.  The court uses "victim" as that is the term used by the plaintiffs in their complaint and briefings.

<u>Prot. Servs. Bd.</u>, 725 S.E.2d 756, 758 (W. Va. 2011).  The Board
is composed of seven board members: the Secretary of DHHR
(Secretary Crouch) or his designee; the Chair of the Governor's
Committee on Crime, Delinquency and Correction or his designee;
and five members appointed by the Governor of West Virginia with
the advice and consent of the Senate, one of whom must be a
representative of the Coalition.  <u>See</u> W. Va. Code § 48-26-
301(b)-(c).  Defendant Patricia Bailey, who is sued in her
official and individual capacities, is currently the Chairperson
of the Board.  <u>See</u> ECF No. 1 ¶ 6

     The Board is mandated to "[r]eceive and consider
applications for licensure of domestic violence programs."  W.
Va. Code § 48-26-401(a)(2).  The West Virginia Domestic Violence
Act, W. Va. Code § 48-26-101 <u>et seq.</u>, defines a "domestic
violence program" as:

> "a licensed program of a locally controlled nonprofit
> organization, established primarily for the purpose of
> providing advocacy services, comprising both a shelter
> component and an outreach component, to victims of
> domestic violence, dating violence, sexual assault,
> stalking or human trafficking, and their children . .
> . .

<u>Id.</u> § 48-26-208.  The Domestic Violence Act does not define the
phrase "shelter component" in the above definition, but the Act
defines the word "shelter" as "residential services offered by a
licensed domestic violence program on a temporary basis, to

persons who are victims of domestic violence, dating violence, sexual assault, stalking or human trafficking, and their children."  Id. § 48-26-214.  The Board interprets this definition of "shelter," when applying the "shelter component" requirement, to mean a "'physical' shelter."  ECF No. 25 at 2; accord ECF No. 27 at 2-3.

On May 18, 2017, Ms. Crawford submitted a pre-application for DVCC to be licensed by the Board as a domestic violence program.  See ECF No. 1 ¶ 8; see also W. Va. Code R. § 191-1-5 (2015) (setting forth licensure application process). In a letter dated July 18, 2017, the Board denied DVCC's pre-application for not satisfying the statutory requirement of having a "physical" "shelter component."  See ECF No. 1 ¶¶ 11, 14; ECF No. 25 at 2-3.  The plaintiffs allege that Ms. Bailey and the Board deliberately misconstrued the applicable state statute and relied on the term "shelter," rather than on the more ambiguous term "shelter component" to deny DVCC's pre-application.  See ECF No. 1 ¶¶ 11-20.  The plaintiffs assert that the statute does not require an actual, physical shelter to meet the "shelter component" requirement, see id. ¶¶ 15-19, and that DVCC has a "shelter component," as it refers "victims of domestic violence to licensed, existing shelters, which

4

routinely accept the victims in a manner similar to hospitals accepting referrals from physicians," id. ¶ 19.[2]

The plaintiffs allege that denial of the pre-application was the result of racially-driven animosity and the Board's efforts to "achieve its objective of discriminating against DVCC and Ms. Crawford on the basis of race." Id. ¶ 14. DVCC had previously submitted four pre-applications in 1996, 2013, 2015, and 2016, all of which had been denied on the ground that DVCC lacked a physical shelter. See id. ¶¶ 13, 20, 23. In its 2017 pre-application, DVCC claimed that the Board's four prior denials were in fact due to racial discrimination. See id.

The Domestic Violence Act provides an appeal process for licensed domestic violence programs that are adversely affected by the Board's decision, but the statute is silent about a similar process for an entity that is not licensed or that is denied a pre-application. See ECF No. 1. ¶¶ 21-22; W. Va. Code § 48-26-408(e); see also W. Va. Code R. 191-1-5.6 (providing internal appeal process when an existing license is

---

[2] The plaintiffs allege that the statute was amended in 2014 "at the request of certain defendants and the Coalition to add the language 'shelter component' as an additional deterrent to DVCC obtaining a license, although previous applications for licensing by DVCC prior to the preceding amendment had also been denied for its not having a physical shelter." ECF No. 1 ¶ 20.

"downgraded or discontinued").  The plaintiffs allege that Ms. Bailey and her predecessor "smugly" informed Ms. Crawford of the lack of an appeal process for DVCC's situation.  ECF No. 1 ¶ 22.

The plaintiffs further allege that the defendants disagree with DVCC's approach to treating the symptoms of domestic violence, a disagreement that encourages the defendants to discriminate against the plaintiffs.  See id. ¶ 31.  Inasmuch as DVCC was founded and is led by Ms. Crawford, an African-American woman, and focuses on serving the African-American community, which faces substantial domestic violence problems in Charleston, West Virginia, and nationwide, the plaintiffs assert that the refusal to license DVCC as a domestic violence program effectively discriminates against Ms. Crawford, DVCC, and the African-American community as a whole.  See id. ¶¶ 24-32.

The plaintiffs allege that the Coalition,[3] a non-profit organization that operates licensed domestic violence centers in West Virginia, see id. ¶ 7, "aided and abetted the other defendants in their discrimination of the plaintiffs," id. ¶ 34. The Coalition's members allegedly spread "rumors and innuendo" that DVCC is not a licensed domestic violence center, that Ms.

---

[3] By statute, one of the Governor's appointees to the Board must be a Coalition representative.  See W. Va. Code § 48-26-301(b)(2).

6

Crawford is "somehow ill qualified," and thus that DVCC is an "unsafe, unfit organization" for victims of domestic violence. Id. ¶ 35.  The Coalition's members are further alleged to have used their power "to lobby and persuade public officials to deny DVCC public funding and recognition."  Id. ¶ 36; see id. ¶¶ 37-38.  For instance, plaintiffs allege that one member used her status to depict DVCC as a "rogue organization" for treating both male and female victims of domestic violence, another member was "verbally and emotionally abusive toward" Ms. Crawford at a public event, and other members persuaded officials of the West Virginia Court of Claims to deny reimbursement to DVCC from the Crime Victims Fund for those victims who received counseling from DVCC.  Id. ¶¶ 37-39. Members also allegedly engaged in the consistent exclusion of Ms. Crawford from participation in public events regarding domestic violence.  See id. ¶¶ 40-41, 45.  The plaintiffs further allege that Ms. Crawford became a target of the Coalition, in part, because she "rebuffed sexual advances" of a former Coalition co-coordinator.  Id. ¶ 44.

Additionally, a former Coalition member allegedly told Ms. Crawford that "racism was present in the Coalition" and that the Coalition "would not tolerate an organization headed by an African-American professional being part of the Coalition or

7

participating in activities involving domestic violence if it could help it." Id. ¶ 42. This "discriminatory exclusion because of Ms. Crawford's race" has allegedly continued to the present. Id.

The plaintiffs initiated this action on March 17, 2018, pursuant to 28 U.S.C. § 1343.[4] The plaintiffs assert eight causes of action.

COUNT 1 alleges that all the defendants violated 42 U.S.C. §§ 1983 and 1985(3) and "the common law" in violation of the rights guaranteed under the Fourteenth Amendment to the United States Constitution. Id. at 12. The count specifically alleges that Ms. Bailey individually and in her official capacity, the Board, and the Coalition conspired to racially discriminate against the plaintiffs, thus denying them equal protection of the law.[5] See id. ¶¶ 48-52. The count also alleges that Secretary Crouch in his official capacity and DHHR acted negligently to allow this conspiracy and racial

---

[4] Section 1343 grants original jurisdiction to federal district courts over any civil action authorized by law and commenced by a person to recover damages or redress for the deprivation of a civil right. See 28 U.S.C. § 1343.

[5] The plaintiffs confirm that Counts 1 to 4 are against Ms. Bailey in both her individual and official capacities. See ECF No. 30 at 2. Count 1 also alleges that the discrimination against the plaintiffs "amounts to racial discrimination toward the local African American community at large because of the client base the plaintiffs serve." ECF No. ¶ 52.

discrimination to occur.  Id. ¶ 53.  The plaintiffs seek an injunction ordering the defendants to cease their allegedly conspiratorial conduct against the plaintiffs and to administer the licensing process in a racially-neutral and objective manner.  Id. at 12.

COUNT 2 alleges that all the defendants violated § 1983 and the Fourteenth Amendment by depriving the plaintiffs of a property interest in a domestic violence program license without due process of law because of racial discrimination. Id. ¶¶ 56-57.  The count relies on the same conduct of the defendants as in Count 1.  Id. ¶ 57.  The plaintiffs seek an order finding that the defendants violated § 1983, and an injunction directing the defendants to "adjudicate the application of [DVCC] in a manner consistent with the foregoing law and constitutional amendment and neutral on the basis of race."  Id. at 13.

COUNT 3 alleges that all the defendants violated § 1983 and the Fourteenth Amendment by denying the plaintiffs equal protection of the law.  Id. at 14.  The count alleges the same conduct of the defendants as in Count 1.  Id.  The plaintiffs seek an order finding that the defendants violated § 1983 and an injunction "directing the defendants to afford the plaintiffs an opportunity to apply for such licensure consistent

with the foregoing law and constitutional amendment in a racially neutral manner." Id.

COUNT 4 alleges that all the defendants, except the Coalition, violated § 1983 and the Fourteenth Amendment by denying the plaintiffs "their rights . . . of equal protection of the law and of property without due process of law" by not having an appeal process for license denial. Id. ¶ 61. The plaintiffs seek an order stating that the defendants violated the plaintiffs' rights by not providing for a right of appeal, and an injunction directing the defendants to "provide an appeal process or recommend the same to the state legislature as well as any other relief the Court deems appropriate including, but not limited to an Order declaring DVCC be awarded a license as domestic violence center." Id. at 15.

COUNT 5 alleges violations of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. § 1 et seq., and seeks damages under 15 U.S.C. § 15 against all the defendants for their conduct amounting to a restraint of trade. See id. ¶ 63. The plaintiffs seek $2 million in damages. Id. at 15.

COUNT 6 alleges a similar claim as Count 5 but seeks an injunction ordering that the defendants cease their actions

amounting to a restraint of trade, pursuant to 15 U.S.C. § 26.[6]
Id. at 15–16.

COUNT 7 alleges that Secretary Crouch, Ms. Bailey in
her individual capacity, DHHR, the Board, and the Coalition
participated in "unlawful conduct" by depriving plaintiffs of a
license and causing financial damages through the loss of public
and private funding opportunities.[7]  See id. at 16.  The
plaintiffs seek $2 million in damages.  Id. at 16–17.

COUNT 8 alleges that Ms. Bailey in her individual
capacity and the Coalition are liable for causing Ms. Crawford
emotional distress.  Id. at 17.  The plaintiffs seek $50,000 in
damages.  Id.

Each defendant filed a motion to dismiss pursuant to
Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which
relief can be granted.  See ECF No. 24; ECF No. 26; ECF No. 31.
The Coalition also moves to dismiss the entire action for lack
of subject matter jurisdiction pursuant to Fed. R. Civ. P.

---

[6] Counts 5 and 6 are only alleged by DVCC, not by Ms. Crawford.
The plaintiffs do not specify whether these counts are alleged
against Ms. Bailey individually or in her official capacity.

[7] Count 7 does not list Ms. Bailey in her official capacity.
Although the complaint does not specify whether Secretary Crouch
is being sued in his official capacity for Count 7, the case
style only lists Secretary Crouch in his official capacity.

12(b)(1).  See ECF No. 32 at 4-5.  The motions have been fully briefed.

## II.  Rule 12(b)(1) Motion to Dismiss

The Coalition moves to dismiss the plaintiffs' complaint for lack of standing pursuant to Rule 12(b)(1).  As set forth below, the court concludes that it has subject matter jurisdiction over Counts 1, 2, 3, and 8 but not over Counts 4, 5, 6, and 7.

## A.  Legal Standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to challenge a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal district courts are courts of limited subject matter jurisdiction, possessing "only the jurisdiction authorized them by the United States Constitution and by federal statute."  U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2008) (citing Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005)).  There is no presumption that a federal district court has jurisdiction."  Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 399 (4th Cir. 1999).  The facts essential to show jurisdiction must be affirmatively alleged in

the complaint. Dracos v. Hellenic Lines, Ltd., 762 F.2d 348, 350 (4th Cir. 1985).

An objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by the court sua sponte, at any stage in the litigation. Arbaugh v. Y&H Corp., 546 U.S. 500, 506 (2006). If subject matter jurisdiction is lacking at any point in litigation, the claim must be dismissed. Id. When a defendant challenges the existence of subject matter jurisdiction under a Rule 12(b)(1) motion, the plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. Jadhav, 555 F.3d at 347; Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999).

Establishing that a plaintiff has standing is necessary to determine jurisdiction because standing is a question of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). Standing involves both constitutional limitations on federal court jurisdiction and prudential limitations on the exercise of that jurisdiction. Id. A plaintiff must demonstrate standing separately "for each claim he seeks to press" and "for each form of relief sought." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006).

Constitutional standing (i.e., Article III standing) is generally addressed under Rule 12(b)(1) because "Article III [of the United States Constitution] gives federal courts jurisdiction only over cases and controversies, and standing is an integral component of the case or controversy requirement." CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 52 (4th Cir. 2011) (internal citation and quotation marks omitted). To satisfy the constitutional standing requirement, a plaintiff must provide evidence to satisfy three elements: (1) the plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical"; (2) there must be "a causal connection between the injury and the conduct complained of," meaning that the injury must be "fairly traceable to the challenged action of the defendant," and not the result of the independent action of some third party not before the court; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000) (internal citations and quotation marks omitted) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). Each element is "an indispensable part of the plaintiff's case" and "must be supported in the same way as any other matter on which the

plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." <u>Lujan</u>, 504 U.S. at 561.

Both individual and organizational plaintiffs must satisfy the standing requirement. <u>White Tail Park, Inc. v. Stroube</u>, 413 F.3d 451, 458 (4th Cir. 2005). An organizational plaintiff may establish standing to bring suit on its own behalf when it seeks redress for an injury suffered by the organization itself or "to vindicate whatever rights and immunities the association itself may enjoy". <u>See</u> <u>Warth</u>, 422 U.S. at 511.

To determine standing at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." <u>Lujan</u>, 504 U.S. at 561 (internal citations omitted). The court may accept as true allegations that are supported by adequate factual matter to render them plausible on their face. <u>Beck v. McDonald</u>, 848 F.3d 262, 270 (4th Cir. 2017) (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). The same presumption of truth does not apply to conclusory statements and legal conclusions contained in the complaint. <u>Id.</u> (citing <u>Iqbal</u>, 556 U.S. at 678).

B.    <u>Standing</u>

    *(1)  Counts 1 to 3*

        Counts 1 to 3 allege claims under 42 U.S.C. § 1983 and § 1985(3) for conspiracy and action under color of law to prevent the plaintiffs from obtaining a license to operate a domestic violence program, which allegedly deprived the plaintiffs of due process and equal protection of the law under the Fourteenth Amendment.

        Section 1983 provides that:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989). The holding of <u>Will</u> "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." <u>Id.</u>

> Section 1985(3) similarly provides that:
>
> If two or more persons in any State . . . conspire
> . . . for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the
> equal protection of the laws, or of equal privileges
> and immunities under the laws . . . the party so
> injured or deprived may have an action for the
> recovery of damages occasioned by such injury or
> deprivation, against any one or more of the
> conspirators.

42 U.S.C. § 1985(3); see also Ziglar v. Abbasi, 137 S. Ct. 1843,

1852 (2017) ("This statutory cause of action allows damages to

persons injured by conspiracies to deprive them of the equal

protection of the laws.").

The Coalition argues that the plaintiffs lack standing

because they have not suffered a cognizable injury. See ECF No.

32 at 4-5. The Coalition asserts that the plaintiffs' alleged

injury of being deprived a domestic violence program license is

not a concrete injury in fact because the plaintiffs do not have

a protected property interest in obtaining such a license. See

id. The plaintiffs do not respond to this argument but instead

argue that they have a constitutional right "to follow an

ordinary occupation or livelihood" and that the Coalition has

deprived them of this right by, inter alia, denying the license.

See ECF No. 33 at 4-5.

Denial of a license constitutes an injury for standing

purposes. See Bostic v. Shaefer, 760 F.3d 352, 371 (4th Cir.

2014) (reviewing denial of marriage licenses to same-sex couples); see also Scott v. Greenville Cty., 716 F.2d 1409, 1414–15, 1415 n.6 (4th Cir. 1983) (holding that the denial of a building permit constituted an injury); cf. S. Blasting Servs., Inc. v. Wilkes Cnty., 288 F.3d 584, 595 (4th Cir. 2002) (explaining that the plaintiffs had not suffered an injury for standing because they had not applied for, or been denied, a permit).  The denial of the license to operate a domestic violence program establishes an injury for standing.

The complaint also asserts that the defendants' conduct caused the plaintiffs' injury.  Based on the facts alleged in the complaint, there is a clear causal connection between the injury alleged and the defendants' alleged conduct. The causation element for standing is thus also satisfied.

For redress, the plaintiffs seek prospective relief in the form of a court order that (1) states that the defendants violated the law, and (2) directs the defendants to review the plaintiffs' pre-application in a racially-neutral and objective manner.  The plaintiffs' proffered interpretation of the licensing statute is persuasive enough to establish redressability.  As previously discussed, W. Va. Code § 48-26-208 requires that domestic violence programs have a "shelter component."  The plaintiffs allege that they have a system that

meets this requirement wherein they refer victims of domestic violence to licensed shelters, similar to the way in which hospitals accept referrals from physicians.  See ECF No. 1.  The language of § 48-26-208 does not explicitly or implicitly require a domestic violence program to have a physical shelter, and it is plausible that the Board is using its interpretation of the statutory language as a pretext to conceal discriminatory intent.  If racial discrimination is in fact the cause of the license denials, then a court order directing the Board to evaluate the plaintiffs' pre-application in a racially-neutral and objective manner would likely redress the alleged wrong. For the foregoing reasons, the plaintiffs have established standing for Counts 1 to 3.

(2)  *Count 4*

Count 4 alleges that all the defendants other than the Coalition harmed the plaintiffs by not providing a right to appeal the denial of a pre-application.  The plaintiffs allege § 1983 claims for the defendants' failure to provide "equal protection of the law and of property without due process of law by allowing procedures to exist under [the defendants'] authority which do not allow a party . . . any right of appeal to a decision by the [Board]."  ECF No. 1 ¶ 61.  The plaintiffs argue that, because there is an appellate process for domestic

19

violence centers that had their licenses revoked, the Board violated the plaintiffs' rights by not establishing an equivalent appeals process for a license application that was denied.  See ECF No. 30 at 4.  The plaintiffs further argue that the Board has the power to create an appeals process for license applications that are denied, and that the lack of such a process is an "oversight" that denies due process.  See id.

There is no constitutional right to an appeal.  See Jones v. Barnes, 463 U.S. 745, 751 (1983); McKane v. Durston, 153 U.S. 684, 688 (1894).  "The violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1549 (2016).  However, no statute gives the plaintiffs a right to an appeal at the pre-application stage, nor has a statute created an obligation for the Board to create such an appeals process.  There has not been a procedural violation and so there is no "invasion of a legally protected interest."  See Lujan, 504 U.S. at 560.  As a result, Count 4 is dismissed against all defendants for lack of subject matter jurisdiction.

### (3)  *Counts 5 and 6*

Counts 5 and 6 allege violations of antitrust laws under the Sherman Act, 15 U.S.C. § 1 et seq., for which

plaintiff DVCC seeks damages under 15 U.S.C. § 15, and injunctive relief under 15 U.S.C. § 26.  See ECF No. 30 at 5-6.

The Sherman Act was enacted to protect the freedom to compete by curtailing the destruction of competition in the market through anticompetitive practices.  Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 315 (4th Cir. 2007).  Section 1 of the Sherman Act declares "[e]very . . . conspiracy, in restraint of trade or commerce among the several States" to be illegal.  15 U.S.C. § 1.  Section 2 makes unlawful any "attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.

The Clayton Act, 15 U.S.C § 12 et seq., operates in conjunction with the Sherman Act to create private causes of action for violations of federal antitrust laws.  See Blue Shield of Va. v. McCready, 457 U.S. 465, 471 (1982); Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 311-13 (1978).  Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover

threefold the damages by him sustained."  15 U.S.C. § 15.[8]

Section 15 provides that "[a]ny person, firm, corporation, or

association shall be entitled to sue for and have injunctive

relief . . . against threatened loss or damage by a violation of

the antitrust laws."  Id. § 26.

"In a private antitrust action, a plaintiff must go

beyond a showing that it meets the Article III standing

requirements of injury, causation, and redressability; it must

also demonstrate 'antitrust standing.'"  Novell, 505 F.3d at

310.  The Supreme Court has held:

> Plaintiffs must prove antitrust injury, which is to
> say injury of the type the antitrust laws were
> intended to prevent and that flows from that which
> makes defendants' acts unlawful.  The injury should
> reflect the anticompetitive effect either of the
> violation or of anticompetitive acts made possible by
> the violation.

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489

(1977).  "It is not enough, however, for a plaintiff merely to

allege that the defendant violated the antitrust laws and that

he was injured.  The injury suffered by the plaintiff must be of

the type the antitrust laws were intended to forestall."  Blue

Shield of Va., 457 U.S. at 486 (internal citations omitted).  In

---

[8] Section 4 is not limited by an amount-in-controversy
requirement that is otherwise required in diversity cases in
federal court.  See 15 U.S.C. § 15.  The plaintiff may recover
"the cost of suit, including a reasonable attorney's fee" in
addition to treble damages.  Id.

other words, the "plaintiff must demonstrate that the nature of the injury he suffered is of the type that makes the challenged practice illegal." Id. at 488.

Antitrust standing restricts a plaintiff's possible causes of action because "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Hawaii v. Standard Oil Co., 405 U.S. 251, 262 n.14 (1972).  "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of [15 U.S.C. § 15] there is a point beyond which the wrongdoer should not be held liable." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983) (internal citation and quotation marks omitted).  The Fourth Circuit applies a five-factor analysis to determine whether a plaintiff has antitrust standing:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

Kloth v. Microsoft, 444 F.3d 312, 324 (4th Cir. 2006) (internal citations and quotation marks omitted).  The first two factors

together encompass the concept of "antitrust injury," while the remaining factors focus on the directness or remoteness of the plaintiff's alleged antitrust injury.  <u>Novell</u>, 505 F.3d at 311.

In considering the harm factor and taking the allegations in the complaint as true, the plaintiffs here fail to demonstrate that the alleged harm is the type of harm that Congress sought to redress in providing a private remedy for violations of the antitrust laws.  The plaintiffs claim that the defendants "are intertwined in conduct to restrict or hinder the plaintiffs from counseling victims of domestic violence."  ECF No. 29 at 3.  Although a conspiracy in restraint of trade is illegal, Congress sought to redress harm that is aimed at monopolizing trade or destroying competition in the market through anticompetitive practices.  The plaintiffs allege broad claims of antitrust activity but fail to specify which antitrust laws the defendants are alleged to have violated, thus leaving it to the court to speculate.  The complaint contains no plausible allegations that the denial of a license or the alleged actions of the defendants produce anticompetitive results in the relevant market, and certainly do not produce a monopoly as the plaintiffs contend.

The court lacks subject matter jurisdiction over Counts 5 and 6 because the plaintiffs fail to plead sufficient

facts to establish standing under the Sherman Act.   Counts 5 and
6 are accordingly dismissed against all defendants.

   *(4)   Count 7*

         Count 7 alleges unlawful conduct by all the
defendants, except Ms. Bailey in her official capacity,[9] in
unlawfully depriving DVCC of a license, which caused DVCC to
lose public and private funding opportunities over the last
twenty-two (22) years.   The count is only alleged by DVCC, not
by Ms. Crawford, for which DVCC seeks monetary damages.

         The plaintiffs assert that Count 7 is a state common-
law cause of action "where conduct occurs that is contrary to
law or unauthorized by law."   ECF No. 29 at 3–4.   Specifically,
the plaintiffs argue that the common-law cause of action stems
from the "deliberate abuse" of the Domestic Violence Act based
on DVCC's repeatedly seeking a license and being unlawfully
refused.   Id.   The plaintiffs also argue that the deprivation
has been in violation of the plaintiffs' rights under the U.S.
Constitution.   Id.   The defendants argue that this claim should
be dismissed because no statutory cause of action for monetary
damages exists under the Domestic Violence Act for "unlawful

---

[9] The plaintiffs affirm that Count 7 is against Ms. Bailey "in an
individual capacity."   ECF No. 30 at 6.

conduct," deprivation, or denial of a license, and no related common-law cause of action exists.  <u>See</u> ECF No. 25 at 13; ECF No. 27 at 11; ECF No. 33 at 18.

Based on the plaintiff's arguments, the court understands this count to potentially allege a common law cause of action for violation of state statutory law, state common law, or rights under the United States Constitution.

The plaintiffs do not cite statutes or cases to support their argument.  They instead merely assert that the unlawful conduct alleged throughout the complaint, including the denial of the license, constitutes some unspecified common law cause of action.  <u>See</u> ECF No. 30 at 6; <u>see also</u> ECF No. 29 at 3–4 (arguing that the "sum of all defendants' conduct has resulted in plaintiffs being unlawfully deprived of a license").  The plaintiffs broadly cite <u>Black's Law Dictionary</u> (revised 4th ed.) as a source "replete with entries confirming that unlawful conduct represents a traditional common-law cause of action," ECF No. 33 at 7, but they do not identify a specific entry or case law to establish that this alleged "traditional common-law cause of action" is part of West Virginia or any other common law.  They instead leave it to the court to speculate and fill in the blanks.  The role of the court is not to guess the plaintiffs' cause of action in order to prepare and argue their

case for them.  The plaintiffs do not articulate any legally-protected interest under common law, and therefore the plaintiffs do not show an invasion of that interest to establish an injury-in-fact for standing.  Further, without a proffered legally-protected interest, it is only speculative that the alleged injury will be redressed by a favorable decision. Without a specific cause of action to guide the court's review of Count 7, the court cannot say that it has subject matter jurisdiction.  Count 7 is therefore dismissed against all defendants.

### (5)  *Count 8*

Count 8 alleges that the "wrongful and unlawful conduct" of Ms. Bailey in her individual capacity and the Coalition caused Ms. Crawford emotional distress to the point of making her physically ill.  Ms. Crawford seeks monetary damages.

Upon review of the pleadings, the court finds that Ms. Crawford has established standing for the court to exercise subject matter jurisdiction.  Ms. Crawford alleges a specific common-law injury in fact for emotional distress and resulting physical illness.  See, e.g., Travis v. Alcon Labs., Inc., 504 S.E.2d 419, 424 (W. Va. 1998) (discussing "intentional or reckless infliction of emotional distress" as a cause of

action).  The allegations in the complaint support the causal connection between the alleged conduct and the harm.  West Virginia law also provides for monetary damages, which are likely to redress Ms. Bailey's harm.  See, e.g., Harless v. First Nat. Bank in Fairmont, 289 S.E.2d 692, 701 (W. Va. 1982) (recognizing the right to recover compensatory damages for emotional distress arising from the wrongful acts of another).

### III. Immunities

The defendants assert immunity from suit under the Eleventh Amendment and qualified immunity.  Based on the following analysis, the court finds that DHHR and the Board enjoy Eleventh Amendment immunity; Secretary Crouch and Ms. Bailey may be subject to suit in their official capacities for some claims; and Ms. Bailey in her individual capacity enjoys qualified immunity for some claims against her.

### C.   Eleventh Amendment Immunity

States enjoy sovereign immunity from suit, which prevents them from being sued in their own courts without their consent.  See Will, 491 U.S. at 67.  The Eleventh Amendment enshrines sovereign immunity of the States by restricting the judicial power of federal courts to hear cases involving States

sued by their own citizens or by citizens of another State.  See U.S. Const. amend. XI; Alden v. Maine, 527 U.S. 706, 728–29 (1999) ("The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle . . . ."). The West Virginia constitution also affirms the sovereign immunity of the State against suit: "The state of West Virginia shall never be made defendant in any court of law or equity . . . ." W. Va. Const art. VI, § 35.

Eleventh Amendment protection extends to "state agents and state instrumentalities," meaning arms of the state and state officials. Cash v. Granville Cty. Bd. of Educ., 242 F.3d 219, 222 (4th Cir. 2001); Parkulo v. W. Va. Bd. of Prob. & Parole, 483 S.E.2d 507, 514 (W. Va. 1996) (holding that agencies and instrumentalities of the State of West Virginia are entitled to sovereign immunity). State officers acting in their official capacity are also entitled to Eleventh Amendment protection because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will, 491 U.S. at 71.

*(1)  DHHR and the Board*

DHHR and the Board argue that the claims against them should be dismissed because they are arms of the State of West Virginia.  See ECF No. 27 at 4-5.

In determining whether a governmental entity is an arm of the State, the most important factor is "whether a judgment against the governmental entity would have to be paid from the State's treasury."  Cash, 242 F.3d at 223; see also; Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48 (1994) (identifying "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations").  Even when monetary relief is not at issue, an entity may still enjoy sovereign immunity "if the judgment would adversely affect the dignity of the State as a sovereign and as one of the United States."  Cash, 242 F.3d at 224.  The Fourth Circuit reviews three additional factors to examine the nature of the entity and its relationship with the State:

> (1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns — whether local or statewide — with which the entity is involved; and (3) the manner in which State law treats the entity.

Id.  This analysis allows a court to determine whether the governmental entity is so connected to the State that the legal

action against the entity would amount to "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." <u>Id.</u> (quoting <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 58 (1996).

DHHR is an executive department of the State and enjoys sovereign immunity from suit.[10]  <u>See</u> <u>Shaffer v. Stanley</u>, 593 S.E.2d 629, 639 (W. Va. 2003) (citing W. Va. Code § 9-2-1a); <u>see also</u> <u>Workman v. Mingo Cnty. Schs.</u>, No. 2:09-cv-00325, 2009 WL 10705163, at *3 (S.D.W. Va. 2009) (because "an act of the West Virginia Legislature created DHHR and allowed it to operate as part of the executive branch," "DHHR is an arm of the state and not subject to this suit pursuant to the Eleventh Amendment").

As a unit of DHHR, the Board also enjoys immunity from suit.  <u>See</u> <u>Shaffer</u>, 593 S.E.2d at 639 (affirming immunity for the Bureau of Child Support Enforcement created within DHHR pursuant to W. Va. Code § 48-18-101(a)).  The Fourth Circuit's three-factor analysis supports the conclusion that the Board

---

[10] The West Virginia Supreme Court of Appeals and the Fourth Circuit have recognized sovereign immunity for other West Virginia executive departments.  <u>See, e.g.</u>, <u>In re T & T Fuels, Inc.</u>, 55 F. App'x 121, 123-24 (4th Cir. 2003) (West Virginia Department of Environmental Protection); <u>Clark v. Dunn</u>, 465 S.E.2d 374, 378 (W. Va. 1995) (West Virginia Department of Natural Resources); <u>Shrader v. Holland</u>, 414 S.E.2d 448, 449 (W. Va. 1992) (West Virginia Department of Highways).

enjoys sovereign immunity as well.  First, the State exercises
complete control over the Board.  Five of the seven members of
the Board are appointed by the Governor, with the advice and
consent of the state senate, and three members are government
officials.[11]  <u>See</u> W. Va. Code § 48-26-301.  As gubernatorial
appointments, all members of the Board "may be removed by the
[G]overnor at his will and pleasure."  <u>See</u> W. Va. Code § 6-6-4.
The state legislature also maintains control over the Board by
approving the legislative rules that the Board promulgates to
guide its work.  <u>See</u> W. Va. Code § 48-26-403; <u>Men & Women</u>
<u>Against Discrimination</u>, 725 S.E.2d at 759; <u>see also</u> Syl. pt. 5,
<u>Smith v. W. Va. Human Rights Comm'n</u>, 602 S.E.2d 445, 447 (W. Va.
2004) (explaining that "[a] regulation that is proposed by an
agency and approved by the Legislature is a 'legislative rule'"
that "has the force and effect of law").  These legislative
rules include the licensure requirements for domestic violence
programs.  <u>See</u> W. Va. Code §§ 48-26-403(b)(2)(A), 48-26-
403(b)(3); W. Va. Code R. § 191-1-5.  Second, the scope of the
Board's authority is statewide.  <u>See</u> W. Va. Code § 48-26-402(a)
("<u>No</u> domestic violence program . . . may represent that it is
licensed unless it is licensed by the [B]oard . . . ." (emphasis

---

[11] One member appointed by the Governor is a representative of
the West Virginia Supreme Court of Appeals.  <u>See</u> W. Va. Code
§ 48-26-301(b)(4).

added)).  Third, a state statute explicitly treats the Board as an arm of the State to implement the provisions of the Domestic Violence Act.  <u>See</u> W. Va. Code § 48-26-401.

DHHR and the Board both enjoy sovereign immunity from suit because they are arms of the State.  The remaining claims against DHHR and the Board therefore are dismissed pursuant to the Eleventh Amendment.

### (2)  *Secretary Crouch and Ms. Bailey in their official capacities*

State officials may be subject to suit in either their personal capacity (i.e., individual capacity) or their official capacity.  Personal-capacity suits seek to impose personal liability upon a state official for actions taken under color of law; official-capacity suits are generally only another way of pleading an action against the government entity and should be treated as a suit against the government.  <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 27 (1991); <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985).  State officials sued in their personal capacity may enjoy qualified immunity.  <u>Graham</u>, 473 U.S. at 166-67.  State officials sued in their official capacity may not take advantage of a qualified immunity defense but may enjoy sovereign immunity.  <u>Id.</u> at 167.

A narrow exception to sovereign immunity under the Eleventh Amendment is the Ex parte Young, 209 U.S. 123 (1908), doctrine, which allows suits against state officers for prospective equitable relief to remedy ongoing violations of federal law.  See Lytle v. Griffith, 240 F.3d 404, 408 (4th Cir. 2001).  The state officer is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct" because, in that case, "[t]he state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Ex parte Young, 209 U.S. at 160.  The doctrine is premised on the idea that states are incapable of authorizing unconstitutional conduct, which creates a legal fiction whereby a state officer engaging in unconstitutional conduct is no longer acting as a state agent and, thus, is not protected by the Eleventh Amendment.  See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997); Lytle, 240 F.3d at 409.

Ex parte Young does not extend to suits where a plaintiff seeks retroactive relief, see Edelman v. Jordan, 415 U.S. 651, 678 (1974); where the claimed violation is based on state law, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984); where the federal law violation occurred entirely in the past and is no longer "ongoing," Green v.

_Mansour_, 474 U.S. 64, 71 (1985); "where Congress has prescribed a detailed remedial scheme for the enforcement against a State" of the claimed federal right, _Seminole Tribe_, 517 U.S. at 74; or where "special sovereignty interests" are implicated, _Coeur d'Alene Tribe of Idaho_, 521 U.S. at 281.

Under the _Ex parte Young_ exception, federal courts may entertain claims against state officials brought by persons at risk of, or suffering from, violations of federally-protected rights by those officials, if the violation for which relief is sought is an ongoing one, and the relief sought is only prospective.  _Verizon Md., Inc. v. Pub. Serv. Comm'n_, 535 U.S. 635, 645 (2002); _Republic of Paraguay v. Allen_, 134 F.3d 622, 627 (4th Cir. 1998).  Past violations may be "ongoing" if they continue to prevent a person from obtaining certain benefits. _See_ _Coakley v. Welch_, 877 F.2d 304, 307 & n.2 (4th Cir. 1989). However, "a future injunction is not made retrospective merely because it recognizes that an ongoing violation of law is the result of a past wrong." _CSX Transp., Inc. v. Bd. of Pub. Works_, 138 F.3d 537, 541-42 (4th Cir. 1998) (citing _Coakley_, 877 F.2d at 306-07).

In _Papasan v. Allain_, 478 U.S. 265 (1986), the Supreme Court held that the unequal distribution of state benefits:

> . . . is precisely the type of continuing violation
> for which a remedy may permissibly be fashioned under
> <u>Young</u>. . . .  [T]he essence of the equal protection
> allegation is the present disparity in the
> distribution of the benefits of state-held assets and
> not the past actions of the State.

478 U.S. at 282.  In <u>Coakley</u>, the Fourth Circuit affirmed the

application of <u>Ex parte Young</u> and rejected Eleventh Amendment

immunity in a suit in which a terminated state employee alleged

a violation of his due process rights for his termination

without good cause, and in which he sought an injunction to be

reinstated.  877 F.2d at 305.  The Fourth Circuit recognized

that the past action continues to harm the terminated employee

by preventing him from obtaining the benefits of state

employment.  <u>See</u> <u>id.</u> at 307 & n.2.

A proper defendant "must have some connection with the

enforcement of the act" that is challenged as an

unconstitutional state action.  <u>Ex parte Young</u>, 209 U.S. at 157;

<u>see also</u> <u>Waste Mgmt. Holdings, Inc. v. Gilmore</u>, 252 F.3d 316,

331 (4th Cir. 2001) ("<u>Ex parte Young</u> requires a 'special

relation' between the state officer sued and the challenged

statute to avoid the Eleventh Amendment's bar.").  The Fourth

Circuit, in dicta, noted that a connection or "special relation"

may be found by, <u>inter alia</u>, statutory enforcement authority or

participation in the decision-making process of the state

agency.  <u>McBurney v. Cuccinelli</u>, 616 F.3d 393, 401 (4th Cir.

2010).  However, "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." Gilmore, 252 F.3d at 331 (internal quotation marks omitted).  The "general duty" of a state officer to enforce state laws does not make the officer a proper defendant in every action attacking the constitutionality of a state statute.  Id. (dismissing Virginia's Governor because he only had a general duty to enforce state laws "by virtue of his position as the top official of the state's executive branch," but not a specific duty to enforce the challenged statutes).

In sum, Secretary Crouch and Ms. Bailey may only be subject to suit in their official capacities under the Ex parte Young exception if three requirements are satisfied: (1) the relief sought is prospective only, (2) the violation for which relief is sought is ongoing, and (3) the defendants have a connection or "special relation" to the challenged state action.

### (i)  *Relief Sought*

The remaining claims against Secretary Crouch and Ms. Bailey in their official capacities are in Counts 1, 2, and 3. All three counts seek prospective relief in the form of an injunction.  Counts 2 and 3 also seek declaratory relief.

The court lacks authority to grant the declaratory relief sought in Counts 2 and 3 against Secretary Crouch and Ms. Bailey in their official capacities because the <u>Ex parte Young</u> exception "does not permit judgments against state officers declaring that they violated federal law in the past."  <u>See</u> <u>P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 146 (1993).

Injunctive relief may be deemed retrospective if its "effect would be to undo accomplished state action and not to provide prospective relief against the continuation of the past violation."  <u>Republic of Paraguay</u>, 134 F.3d at 628.  The plaintiffs here do not seek an injunction overturning the decision of the Board.  Counts 1, 2, and 3 seek an injunction directing the Board to act in a certain way so as not to continue violating the plaintiffs' rights.  It would direct defendants to conduct the licensing process in a racially-neutral manner that does not violate due process or equal protection rights under the Fourteenth Amendment.  Such a remedy would provide prospective relief.

### (ii) <u>Ongoing Violation</u>

Throughout the complaint, the plaintiffs allege that Counts 1, 2, and 3 stem from racial discrimination toward Ms.

Crawford and DVCC.  Racial disparity constitutes a present and
ongoing violation.  In Papasan v. Allain, the Supreme Court
considered a suit alleging a disparity between the financial
support available to schools in land previously held by the
Chickasaw Indian Nation, which resulted in depriving
schoolchildren of a "minimally adequate level of education and
of the equal protection of the laws."  478 U.S. at 274.
Although the disparity was a result of past actions, the Court
held:

> This alleged ongoing constitutional violation — the
> unequal distribution by the State of the benefits of
> the State's school lands — is precisely the type of
> continuing violation for which a remedy may
> permissibly be fashioned under Young. . . .  A remedy
> to eliminate this current disparity . . . would ensure
> "compliance in the future with a substantive federal-
> question determination" rather than bestow an award
> for accrued monetary liability.

Id. at 282 (internal quotation marks, emphasis, and citation
omitted).  The Fourth Circuit has similarly recognized an
ongoing violation of rights stemming from a past violation.
See, e.g., Coakley, 877 F.2d at 305 (finding a violation of due
process for a state employee who was fired without cause).

        The plaintiffs here allege that their rights were
violated because of racial discrimination.  They allege that
they were treated differently and with animus by the defendants
because of Ms. Crawford's race.  As in Papasan, this racial

disparity results in an alleged ongoing violation of federal rights.  As in Papasan and Coakley, the plaintiffs also allege they were denied substantial benefits from the State as a direct result of these violations.  The harms include the plaintiffs continued inability to pursue certain funding opportunities or to serve their community in the manner they believe best because they lack a domestic violence program license.  See ECF No. 1 ¶¶ 24-29, 36, 38.  Furthermore, because DVCC has been denied a license five times, it is probable, and not mere conjecture, that, if it again seeks a domestic violence program license in the future, it will again be denied unless the requested prospective relief is granted.  Accordingly, the defendants' alleged violations of the plaintiffs' federal rights in Counts 1, 2, and 3 are ongoing.

### (iii) Connection or Special Relation

The alleged violation of the plaintiffs' rights stem from the denial of a license by the Board.  Both Secretary Crouch and Ms. Bailey have a connection to this challenged state action due to their roles in their respective agencies. Secretary Crouch oversees DHHR, of which the Board is a component.  See, e.g., W. Va. Code § 27-1A-4 (listing powers and duties of the Secretary of DHHR).  He or someone he designates is also a member of the Board.  See W. Va. Code § 48-26-301(c).

Ms. Bailey, as the Board's Chairperson, oversees the work of the Board and is the official representative of the Board. See W. Va. Code R. § 191-1-3 (describing the duties and responsibilities of the Chairperson). These connections to the Board satisfy the "special relationship" requirement for application of the Ex parte Young exception.

Based on the requirements for the Ex parte Young exception, the court finds that Secretary Crouch and Ms. Bailey may be subject to suit in their official capacities.

D.   Qualified Immunity

State officials sued in their personal capacity, as is Ms. Bailey, do not enjoy sovereign immunity, but they may enjoy qualified immunity. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). "The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. As a result, it is important for courts to resolve questions of qualified immunity at the earliest possible stage of litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam). The determination of whether an official is entitled to qualified

immunity is "purely [a] legal question."  Siegert v. Gilley, 500
U.S. 226, 232 (1991).

The doctrine of qualified immunity provides that
"government officials performing discretionary functions
generally are shielded from liability for civil damages insofar
as their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have
known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
Qualified immunity protects government officials from "bad
guesses in gray areas" to ensure that they may only be liable
"for transgressing bright lines."  Maciariello v. Sumner, 973
F.2d 295, 298 (4th Cir. 1992).  The standard for analyzing an
official's conduct is objective reasonableness, and, generally,
"[s]ubjective factors involving the officer's motives, intent,
or propensities are not relevant."  Rowland v. Perry, 41 F.3d
167, 173 (4th Cir. 1994).

The Supreme Court has articulated a two-step process
for resolving qualified immunity claims: (1) decide whether the
facts alleged by the plaintiff make out a violation of a
constitutional (or statutory) right, and (2) decide whether the
right at issue was "clearly established" at the time of the
defendant's alleged misconduct.  Saucier v. Katz, 533 U.S. 194,
201 (2001).  Lower court judges should "exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The plaintiffs assert the remaining counts (Counts 1, 2, 3, and 8) against Ms. Bailey in her individual capacity. Ms. Bailey argues that she is entitled to qualified immunity because she was engaged in a discretionary function in her role as the Board's Chairperson. See ECF No. 25 at 9-12. The plaintiffs argue that Ms. Bailey is not entitled to qualified immunity because "she is part of [a] coterie of persons, not exercising a discretionary function but instead seeking to maintain a closed shop apparatus that excludes the plaintiffs." ECF No. 30 at 5. The plaintiffs further argue that there is "no exercise of discretion where an arbitrary interpretation of an explicit statute occurs in light of a litany of disparagement," referring to the alleged wrongdoing committed by Ms. Bailey and her colleagues against the plaintiffs over several years. See id.

A discretionary function "involves an element of judgment or choice." Berkovitz ex rel. Berkovitz v. United States, 486 U.S. 531, 536 (1988); Harlow, 457 U.S. at 816 (contrasting discretionary actions with "ministerial" tasks). "A law that fails to specify the precise action that the

official must take in each instance creates only discretionary authority." <u>Davis v. Scherer</u>, 468 U.S. 183, 196 n.14 (1984). The Domestic Violence Act gives broad discretion to the Board to issue or deny a license to operate a domestic violence program. In particular, the Act tasks the Board with the duty to "[r]eceive and consider applications for licensure of domestic violence programs." W. Va. Code § 48-26-401(a)(1). The Board makes decisions by a vote of its members. <u>See, e.g.</u>, <u>id.</u> § 48-26-406(b) (discussing the need for a unanimous vote to close a domestic violence program); W. Va. Code R. § 191-1-5.4.a.1 (explaining that a provisional license may be extended if the Board so determines "in its sole discretion"). Each member must use "an element of judgment or choice" in deciding how to vote on an issue. The denial of a license is a discretionary function because it results from this judgment or choice.

     Counts 1, 2, and 3 against Ms. Bailey in her individual capacity arise from her role as the Board's Chairperson in denying a license to the plaintiffs. The Board explained that this denial was based on the plaintiffs' failure to meet the statutory requirements of a "shelter component" based on the Board's interpretation of "shelter component" in the West Virginia Domestic Violence Act. <u>See</u> ECF No. 1 ¶¶ 14, 18. It is not clearly established that the denial of a license

based upon the failure to meet a statutory requirement violates a federal constitutional or statutory right.  The plaintiffs also do not address whether such a right exists.  Ms. Bailey is therefore entitled to qualified immunity for Counts 1, 2, and 3. Count 8 asserts a West Virginia common law claim of emotional distress based on the "conduct" of Ms. Bailey (and the Coalition).  The alleged conduct is not specifically limited to the discretionary functions associated with the denial of the license.  The court reviews this claim on its merits.

### IV.  Rule 12(b)(6) Motion to Dismiss

A.  <u>Legal Standard</u>

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleader provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint.  <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999).

Specific facts are not necessary in a pleading, "but

only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The pleading "must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Id. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Iqbal, 556 U.S. at 678 (explaining that the Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Twombly, 550 U.S. at 572).  However, the court is not required to accept as true the legal conclusions set forth in a plaintiff's complaint.  Edwards, 178 F.3d at 244. The motion should only be granted if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief."  Id.

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  See Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  To contain sufficient factual matter to make a claim plausible, the factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

B.    Count 1

The plaintiffs bring this count for conspiracy under 42 U.S.C. §§ 1983 and 1985(3) and the common law in violation of rights under the Fourteenth Amendment.  Counts 2 and 3 also assert § 1983 claims.  The court therefore treats Count 1 as only a claim under § 1985(3) and the common law.  The only remaining defendants in Count 1 are Secretary Crouch and Ms. Bailey in their official capacities and the Coalition.

To establish a claim for a conspiracy under § 1985(3), a plaintiff must prove five elements:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995); see also

United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,

463 U.S. 825, 828 (1983).

　　　　　To prove the "conspiracy" element, a claimant must

show an agreement or a "meeting of the minds" between the

defendants to violate the claimant's constitutional rights.

Simmons, 47 F.3d at 1377.  "[M]erely conclusory allegations of

conspiracy, unsupported by a factual showing of participation in

a joint plan of action, are insufficient to support a section

1985(3) action. . . ."  Id. at 1376.  The Fourth Circuit has

specifically rejected § 1985(3) claims "whenever the purported

conspiracy is alleged in a merely conclusory manner, in the

absence of concrete supporting facts."  Id. at 1377; see, e.g.,

Gooden v. Howard Cnty., 954 F.2d 960 (4th Cir. 1992) (en banc)

(dismissing a § 1985 conspiracy claim for failing to "plead

specific facts in a nonconclusory fashion to survive a motion to

dismiss"); Scott v. Greenville Cnty., 716 F.2d 1409, 1424 (4th

Cir. 1983) (noting that "even overtly biased citizens who . . .

speak up at public meetings, or even express their prejudices in

private meetings with public officials without formulating a

joint plan of action are not 'conspiring' with those officials

in a way that subjects them to § 1983 liability").

> Under West Virginia state law:
>
> A civil conspiracy is a combination of two or
> more persons by concerted action to accomplish an
> unlawful purpose or to accomplish some purpose,
> not in itself unlawful, by unlawful means. The
> cause of action is not created by the conspiracy
> but by the wrongful acts done by the defendants
> to the injury of the plaintiff.

Syl. Pt. 8, Dunn v. Rockwell, 689 S.E.2d 255, 259 (W. Va. 2009).

A civil conspiracy under West Virginia law is a legal doctrine

"under which liability for a tort may be imposed on people who

did not actually commit a tort themselves but who shared a

common plan for its commission with the actual perpetrator(s)."

Syl. pt. 9, Dunn, 689 S.E.2d at 259.

### (1)   *Secretary Crouch in his official capacity*

The plaintiffs do not allege that Secretary Crouch

engaged in the alleged conspiracy, but rather they allege that

Secretary Crouch "acting under color of state law negligently

. . . allowed this conspiracy and racial discrimination to occur

thus allowing the denial of DVCC's pre-application for licensure

as a domestic violence center to occur." ECF No. 1 ¶ 53.  The

plaintiffs do not plead any additional facts that Secretary

Crouch in any way participated in a joint plan of action.

Conspiracy is an intentional act, not a negligent one.  Young v.

F.D.I.C., 103 F.3d 1180, 1190 (4th Cir. 1997); Mallamo v. Town

of Rivesville, 477 S.E.2d 525, 533 (W. Va. 1996).  Acting

negligently to allow an alleged conspiracy to occur does not impose liability on Secretary Crouch.  Count 1 is therefore dismissed as to Secretary Crouch.

### (2)  *Ms. Bailey in her official capacity and the Coalition*

The plaintiffs allege that Ms. Bailey in her official capacity "engaged in conduct with [the Coalition] and its principal members under color of state law in violation of 42 U.S.C. 1985 to prevent DVCC from becoming a licensed domestic violence program."  ECF No. 1 ¶¶ 48, 52.  The plaintiffs contend that the defendants' racial discrimination towards the plaintiffs and the subsequent denial of a license "amounts to a conspiracy to prevent plaintiffs from fully participating in efforts to combat the domestic violence in this state."  Id. ¶ 51.  The plaintiffs further assert that this "conspiratorial conduct" between Ms. Bailey and the Coalition "amounts to racial discrimination toward the local African American community at large because of the client base the plaintiffs serve."  Id. ¶ 52.

Upon review of the complaint and briefings, there are no allegations to indicate that Ms. Bailey or the Coalition, or any Coalition members, communicated with each other, another defendant, or any other person to establish a joint plan of

action for the Board to deny a license to the plaintiffs on the
basis of racial discrimination.  The other allegations against
the Coalition bear no relation to the plaintiffs' license
denial.[12]  The complaint "fails to allege with any specificity
the persons who agreed to the alleged conspiracy, the specific
communications amongst the conspirators, or the manner in which
such communications were made," and thus the claim is not
sufficient to survive a motion to dismiss.  <u>A Soc'y Without a</u>
<u>Name v. Virginia</u>, 655 F.3d 342, 347 (4th Cir. 2011) (affirming a
dismissal of a § 1985(3) conspiracy claim for these same
reasons).  There are no alleged facts to support a claim for a
racially-motivated conspiracy to deprive the plaintiffs of a
license and their constitutional rights under § 1985(3) beyond a
conclusory allegation.

    With regard to the common law charge of conspiracy,
the complaint does not allege a "concerted action" or "common

---

[12] These allegations include that the Coalition spread rumors
that DVCC is not licensed and that Ms. Crawford is not
qualified, EFC No. 1 ¶ 35; that the Coalition lobbied and
attempted to persuade other public officials to deny DVCC public
funding and recognition, <u>id.</u> ¶¶ 36, 38; that the Coalition
portrayed DVCC as a "rogue organization," <u>id.</u> ¶ 37; that the
Coalition would attempt to prevent DVCC from becoming a member
because it is headed by an African-American, <u>see id.</u> ¶ 42; that
some members of the Coalition "intervened to have Ms. Crawford"
excluded from taking a test, <u>id.</u> ¶ 43; and that the Coalition
attempted to prevent plaintiffs from finding out about and
attending public events, <u>id.</u> ¶¶ 41, 45.

plan" between Ms. Bailey and any members of the Coalition, or between these defendants and any other person, to deprive the plaintiffs of their rights to equal protection of the law or due process in their quest to obtain a domestic violence program license.  Accordingly, Count 1 is dismissed against Ms. Bailey in her official capacity and the Coalition.

C.   <u>Count 2</u>

Count 2 alleges that all the defendants acted under color of state law to deprive the plaintiffs of a license as a domestic violence program, which "constitutes a property interest as defined by the laws of the United States of America," without due process of law in violation of § 1983 and the Fourteenth Amendment.  The only remaining defendants in Count 2 are Ms. Bailey and Secretary Crouch in their official capacities, and the Coalition.

To sustain a § 1983 claim, a plaintiff must prove that he or she was deprived of a constitutional right by a defendant acting under color of state law, <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150 (1970), and that the defendant was personally involved in the deprivation of the constitutional rights, <u>Wright v. Collins</u>, 766 F.2d 841, 850 (4th Cir. 1985).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  A claim under either the procedural or substantive component of the due process clause requires that the plaintiff first establish a protected interest of which it has been deprived.  <u>See</u>, <u>e.g.</u>, <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 59 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"); <u>Gravitte v. N.C. Div. of Motor Vehicles</u>, 33 Fed. App'x 45, 48 (4th Cir. 2002) (per curiam) ("A plaintiff seeking to assert a substantive due process claim must allege the deprivation of a cognizable interest in life, liberty, or property; a mere allegation of 'arbitrary' government conduct in the air, so to speak, will not suffice.").

The interest sought to be protected here is an alleged property interest.  "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits.  These interests — property interests — may take many forms."  <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 576 (1972).  To have a property interest in a benefit, a person

must have "a legitimate claim of entitlement to it" under federal or state law, which means having more than just an abstract need or desire for it, or a unilateral expectation of it.  Id. at 577; see also Syl. pt. 6, State ex rel. Anstey v. Davis, 509 S.E.2d 579, 582 (W. Va. 1998).  Property interests are not created by the Constitution, but "[r]ather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Roth, 408 U.S. at 577.

For a procedural due process challenge, a plaintiff must show three elements: "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate."  Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145 (4th Cir. 2009) (citing Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988)).  For a substantive due process challenge, a plaintiff must show that the agency with the authority to issue the claimed benefit "lacks all discretion to deny issuance of the [benefit] or to withhold its approval."  Gardner v. City of Balt. Mayor & City Council, 969 F.2d 63, 68 (4th Cir. 1992) (considering land use permits).  "Any significant discretion conferred upon the local agency defeats

the claim of a property interest." Id.  A cognizable property interest exists "only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." Id. (citation omitted).  The standard "focuses on the amount of discretion accorded the issuing agency by law, not on whether or to what degree that discretion is actually exercised." Id.

In Scott v. Greenville County, the Fourth Circuit found a cognizable property interest in a building permit based on the determination that the county was required by state law to issue a permit "upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance."  716 F.2d 1409, 1418 (4th Cir. 1983).  Conversely, the Fourth Circuit in Gardner determined that the petitioner did not have a legitimate claim of entitlement to a public works agreement because the state and municipal law accorded the city discretion to refuse to issue an agreement.  969 F.2d at 69.

Under West Virginia law, a "protected property interest is present only when the individual has a reasonable expectation of entitlement deriving from the independent source." Syl. Pt. 6, Anstey, 509 S.E.2d at 582.  West Virginia recognizes several protected property interests, including driver's licenses, relief from garnishment of wages, welfare

rights, and dismissal from government employment.  North v. W.
Va. Bd. of Regents, 233 S.E.2d 411, 415 (W. Va. 1977) (citing
U.S. Supreme Court cases).  However, the recognition of many of
these property interests arises in the context in which someone
already possesses the property and is challenging the
deprivation of that possessed property.  See, e.g., Zaleski v.
W. Va. Physicians' Mut. Ins. Co., 647 S.E.2d 747, 756 (W. Va.
2007) (finding a property interest in continued malpractice
coverage issued by a state actor); Syl. Pt. 1, Jordan v.
Roberts, 246 S.E.2d 259, 260 (W. Va. 1978) (recognizing a
driver's license as a property interest that requires due
process protection before it can be suspended).  The Supreme
Court has similarly held that the suspension of a license
already held by a person implicates a protected property
interest.  See, e.g., Barry v. Barchi, 443 U.S. 55, 66 (1979)
(horse trainer license); Mackey v. Montrym, 443 U.S. 1, 10
(1979) (driver's license).

       In the instant case, the Board is tasked with the
authority and discretion to determine whether to issue a license
for a domestic violence program, and it is the only entity with
the power to issue such a license in West Virginia.  See Men &
Women Against Discrimination, 725 S.E.2d at 758-59 (citing W.
Va. Code § 48-26-401).  As previously discussed, a discretionary

function involves judgment or choice, <u>Berkovitz</u>, 486 U.S. at 536, and a law that does not specify the precise action that an official must take in each instance creates discretionary authority for that official, <u>see Davis</u>, 468 U.S. at 196 n.14. The Board has broad discretion to issue or deny a domestic violence program license.  <u>See</u> W. Va. Code § 48-26-401(a)(1) (explaining the role of the Board to "[r]eceive and <u>consider</u> applications for licensure of domestic violence programs" (emphasis added)).  The Board also makes decisions by a vote of its members, which requires its members to use judgment in deciding action on a given issue.  Due to the discretion and authority of the Board to evaluate applications and to issue licenses, it cannot be said that the plaintiffs have a "legitimate claim of entitlement" to a license.[13]  <u>Cf. Gardner</u>, 969 F.2d at 69 (finding no legitimate claim of entitlement to a public works agreement where the city has discretion to refuse to issue an agreement).

       Even if the plaintiffs had a legitimate claim of entitlement to a domestic violence program license, that

---

[13] Like the cases discussing suspension of licenses, the protected interest in a license likely arises when someone who already has a domestic violence program license faces the risk of revocation or suspension.  The Board provides due process in this situation through the appeal process.  <u>See</u> W. Va. Code § 48-26-408.

entitlement could only arise when the plaintiffs satisfy the statutory requirements for such a license.  State law enumerates the requirements that must be satisfied to receive a license. As previously discussed, the stated reason why the plaintiffs were denied a license was the failure to satisfy the statutory requirement for a shelter component.[14]  See ECF No. 1 ¶ 14.

The plaintiffs also argue in their responses to Ms. Bailey and the Coalition's motions to dismiss that they have a cognizable property interest in "a calling or right to earn a livelihood," which amounts to a property right protected by the U.S. Constitution.  ECF No. 30 at 3-4; see ECF No. 33 at 4-5 (claiming a "Constitutional right to follow an ordinary occupation or livelihood").  This alleged property right is not mentioned in the complaint, which instead focuses on the property interest of the license.  The court cannot consider the additional alleged property interest of a calling or livelihood as a protected interest under Count 2 because "[i]t is well-established that parties cannot amend their complaints through briefing."  S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands LLC, 713 F.3d 175, 185 (4th Cir. 2013).

---

[14] Count 3 addresses the equal protection claim relating to the interpretation of the statutory requirements.

Count 2 is dismissed against all remaining defendants because the plaintiffs have not demonstrated that they were deprived of a cognizable property interest.

D.   <u>Count 3</u>

Count 3 alleges that the defendants violated § 1983 and the Fourteenth Amendment by racially discriminating against the plaintiffs in the licensing process, thus denying them equal protection of the laws.  Specifically, the plaintiffs allege that racial discrimination towards the plaintiffs was the motivating factor for the Board to misinterpret W. Va. Code § 48-26-208 to require a physical shelter for the "shelter component" requirement.  <u>See</u> EFC No. 1 ¶ 14.  As with Counts 1 and 2, the only remaining defendants in Count 3 are Ms. Bailey and Secretary Crouch in their official capacities, and the Coalition.

As previously explained in Count 2, to sustain a § 1983 claim, a plaintiff must prove that he or she was deprived of a constitutional right by a defendant acting under color of state law who was personally involved in the deprivation. <u>Adickes</u>, 398 U.S. at 150; <u>Wright</u>, 766 F.2d at 850.  The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause requires the consideration of "whether the classifications drawn by any statute constitute an arbitrary and invidious discrimination" because "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." Loving v. Virginia, 388 U.S. 1, 10 (1967). The clause does not forbid States from creating classifications, but it "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

To succeed on an equal protection claim, a plaintiff must first demonstrate (1) that "he has been treated differently from others with whom he is similarly situated," and (2) that "the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. Any racial classification must meet "strict scrutiny" because when government decisions "touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the

burden he is asked to bear on that basis is precisely tailored
to serve a compelling governmental interest." Fisher v. Univ.
of Tex., 570 U.S. 297, 307–08 (2013) (quoting Regents of Univ.
of Cal. v. Bakke, 438 U.S. 265, 299 (1978)); see also Grutter v.
Bollinger, 539 U.S. 306, 308 (2003).

A "race-based action" does not violate the Equal
Protection Clause if the action is (1) "necessary to further a
compelling governmental interest" and (2) "is narrowly tailored
to further that interest." See Grutter, 539 U.S. at 308; see
also Cooper v. Harris, 137 S. Ct. 1455, 1464 (2017) (explaining
that the State bears the burden to prove that a race-based
action serves a "compelling interest" and is "narrowly tailored"
to that end). Context matters in reviewing race-based actions
because "[n]ot every decision influenced by race is equally
objectionable, and strict scrutiny is designed to provide a
framework for carefully examining the importance and the
sincerity of the government's reasons for using race in a
particular context." Grutter, 539 U.S. at 308.

(1) *Secretary Crouch and Ms. Bailey in their official
capacities*

The plaintiffs allege that the Board deliberately and
repeatedly misinterpreted the relevant statutes with licensure
requirements by applying an "arbitrary interpretation of an

explicit statute," and that this conduct "serves as a front for [the defendants'] ulterior discriminatory intent" to prevent the plaintiffs from counseling domestic violence victims.  See ECF No. 30 at 3, 5.  The plaintiffs also allege that Ms. Bailey played the primary role in denying the plaintiffs a license through her domination of the discussion at the open meeting where the plaintiffs' pre-application was denied.  Id. at 3.

Ms. Bailey asserts that the plaintiffs fail to plead a claim for racial discrimination under the Fourteenth Amendment. ECF No. 25 at 8-9.  Specifically, she contends that no facts have been alleged to suggest that race was taken into consideration in reviewing the plaintiffs' application for licensure and that the plaintiffs fail to plead any disparate treatment or to demonstrate that they were treated differently than other similarly-situated persons or entities.  See id.  Ms. Bailey also asserts that she is not liable under Count 3 because she, as the Board's Chairperson, does not have individual authority to deny a license unilaterally; the Board as a group has the "sole authority to determine and/or consider an application to become a licensed domestic violence program." Id. at 8-9 (citing W. Va. Code § 48-26-401(a)(2)).

The plaintiffs do not allege that any other person or entity that also did not have a physical shelter was awarded a

domestic violence program license.  The plaintiffs argue that no person or entity is similarly situated to them because Ms. Crawford and DVCC have been singled out by the Board and the Coalition.  ECF No. 33 at 5.  The plaintiffs also contend that "[t]he summary manner in which plaintiffs' application for a counseling license was rejected aptly illustrates the disparate treatment the plaintiffs have consistently received."  Id.

Since context matters in each case alleging racial discrimination, see Grutter, 539 U.S. at 308, the court must consider the specific context in which the plaintiffs' allege that the denial of a license occurred.  The plaintiffs allege a pattern by which the Board deliberately misconstrues the applicable statute, W. Va. Code § 48-26-208, "to achieve its objective of discriminating against DVCC and Ms. Crawford on the basis of race."  ECF No. 1 ¶ 14.

Although the defendants assert that the plaintiffs' failure to meet the statutory requirements resulted in the denial of a license, the statutory language is not so definitive.  The Domestic Violence Act requires that a licensed program have a "shelter component."  W. Va. Code § 48-26-208.  Section 48-26-214 defines the term "shelter" as "residential services offered by a licensed domestic violence program on a temporary basis."  The Board interprets this definition of

"shelter" to mean a "physical" shelter for purposes of the "shelter component."  See ECF No. 25 at 2; ECF No. 27 at 2-3. However, there is nothing explicit in the statute that requires a domestic violence program to have a physical shelter.  The statute only requires that a program offer "residential services," a term which itself is not defined.  Ms. Crawford asserts that she provides a "shelter component" through a system wherein victims are referred to existing licensed shelters.  ECF No. 1 ¶ 19.

Based on the language of the statute, the plaintiffs' interpretation appears reasonable.  The Domestic Violence Act defines a "domestic violence program" as a "licensed program . . . established primarily for the purpose of providing advocacy services . . . to victims of domestic violence."  W. Va. Code § 48-26-208 (emphasis added).  "Advocacy" is defined as "assisting victims and survivors of domestic violence . . . in securing rights, remedies and services, by directly providing for, or referring to public and private agencies to provide for . . . shelter."  Id. § 48-26-202 (emphasis added).  This definition stipulates that a domestic violence program, in fulfilling its statutory purpose of providing "advocacy services," may either directly provide shelter or refer victims to other agencies to provide shelter.  While the statutory

definition of "shelter," being that of "residential services offered by a licensed domestic violence program," could, standing alone, be interpreted as requiring the domestic violence program itself to provide the shelter, the definition of "advocacy services" prescribes that shelter and a broad range of services can be provided by referral.

Based on these definitions, the court understands the plaintiffs to allege that they are being treated differently from similarly-situated entities that also have a "shelter component."  The court concludes that the allegations in the complaint are sufficient to support a reasonable inference that the Board's statutory interpretation was motivated by or was a pretext for discrimination because of Ms. Crawford's race.

The complaint sufficiently alleges that Secretary Crouch and Ms. Bailey were both personally involved in the alleged deprivation of the plaintiffs' constitutional rights. They were both members of the Board that reviewed the pre-application and the statutory requirements and decided to deny the plaintiffs a license.  Ms. Bailey, as the Board's Chairperson, oversees the work of the Board and serves as its official representative.  <u>See</u> W. Va. Code R. § 191-1-3. Secretary Crouch is the Secretary of DHHR, of which the Board is

a component, and he is therefore responsible for the actions of the Board.

        For the foregoing reasons, the plaintiffs' allegations are deemed sufficient to state a § 1983 claim against Secretary Crouch and Ms. Bailey in their official capacities under the Equal Protection Clause of the Fourteenth Amendment.

    (2)  *The Coalition*

        The claim against the Coalition arises from the allegation that the organization itself, and through its members, has aided and abetted the defendants in their discrimination of the plaintiffs.  ECF No. 1 ¶ 34.  A former Coalition member also allegedly stated that "racism was present in the Coalition" and that Coalition members "would not tolerate an organization headed by an African-American professional" being a licensed domestic violence program.  See id. ¶ 42.

        The Coalition asserts that it could not have acted under color of state law to deprive the plaintiffs of equal protection through the license denial because it "possesses no authority related to the issuance" of a license.  See ECF No. 32 at 5-8.  The Coalition also emphasizes that the Board, as a collective, possesses the "sole authority" to review applications and decide whether to issue domestic violence

program licenses.  See W. Va. Code § 48-26-402; W. Va. Code St.
R. § 191-1-5.2.a (empowering the Board to "issue an initial or
renewal license to any organization which has been approved by
the Board as having complied with all established standards").
The plaintiffs respond by arguing that the Coalition's
"conspiratorial role of excluding the plaintiffs amounts to
joint activity with the governmental defendants," and the
"pervasive entwinement" with the governmental defendants makes
the Coalition liable as a private entity for the constitutional
claims.  See ECF No. 33 at 3-4.

        A private party involved with a state actor in a
conspiracy to violate someone's rights under the Fourteenth
Amendment can be liable under § 1983, even though the private
actor is not an official of the State.  Adickes, 398 U.S. at
152.  "Private persons, jointly engaged with state officials in
the prohibited action, are acting 'under color' of law for
purposes of the statute."  Id. (quoting United States v. Price,
383 U.S. 787, 794 (1966)).  To act "under color" of law does not
require that the accused be an officer of the State, but rather
that he be "a willful participant in joint activity with the
State or its agents."  Price, 383 U.S. at 794.

        The court previously reviewed the claims that the
Coalition engaged in conspiratorial conduct with state actors in

Count 1.  For the reasons set forth in that analysis, a claim for conspiracy to deprive the plaintiffs of equal protection cannot stand against the Coalition.  There are no allegations or facts to demonstrate that the Coalition and the other defendants "reached an understanding" to deny the plaintiffs equal protection.  Accordingly, Count 3 is dismissed against the Coalition.

E.   Count 8

        Count 8 asserts "emotional distress" claims against defendants Ms. Bailey in her individual capacity and the Coalition.  "Emotional distress" is not recognized as a cause of action in West Virginia.  Instead, the State recognizes two distinct causes of action: (1) intentional or reckless infliction of emotional distress (i.e., the "tort of outrage"), and (2) negligent infliction of emotional distress.  The court reviews the plaintiffs' claims under each cause of action.

     (1)   Intentional Infliction of Emotional Distress

        "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily

harm." Syl. Pt. 6, <u>Harless</u>, 289 S.E.2d at 694.  A claim for intentional inflection of emotional distress does not require physical injury.  <u>See</u> <u>Hines v. Hills Dep't Stores, Inc.</u>, 454 S.E.2d 385, 389 (W. Va. 1994).  Instead, a plaintiff must establish four elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, <u>Travis</u>, 504 S.E.2d at 421.

The first element is a showing that the defendants' actions towards the plaintiff were "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." <u>Id.</u> at 425.  The defendants' conduct "must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." <u>Id.</u> (citation omitted).  The defendant's conduct must meet the following standard:

> Liability has been found only where the conduct has
> been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community. . . . The
> liability clearly does not extend to mere insults,
> indignities, threats, annoyances, petty oppressions,
> or other trivialities. . . . There is no occasion for
> the law to intervene in every case where some one's
> feelings are hurt.

Tanner v. Rite Aid of W. Va., Inc., 461 S.E.2d 149, 156–57 (W.

Va. 1995) (quoting Restatement (Second) of Torts § 46, cmt. d

(1965)); see also Travis, 504 S.E.2d at 425–26.[15]  "[C]onduct

that is merely annoying, harmful of one's rights or

expectations, uncivil, mean-spirited, or negligent does not

constitute outrageous conduct."  Courtney v. Courtney, 413

S.E.2d 418, 423 (W. Va. 1991); see also Hines, 454 S.E.2d at 389

(explaining that conduct that is "mean-spirited and petty" does

not rise to the required level of outrageousness).

        "[T]he role of the trial court is to first determine

whether the defendant's conduct may reasonably be regarded as so

extreme and outrageous as to constitute the intentional or

reckless infliction of emotional distress."  Syl. Pt. 4, Travis,

504 S.E.2d at 421.  The court determines the threshold legal

---

[15] The extreme and outrageous character of the conduct may arise
from the defendant's knowledge that the plaintiff is peculiarly
susceptible to emotional distress (e.g., by reason of some
mental condition).  Travis, 504 S.E.2d at 426 (citing
Restatement (Second) of Torts § 46, cmt. f (1965)).  Neither
party alleges this condition in this case.

question of whether the conduct "may reasonably be considered
outrageous," but the determination of whether the conduct is in
fact outrageous is a jury question.  Id.

        The second element requires a showing that the
defendant acted with the intent to inflict emotional distress
upon the plaintiff, or acted in a reckless manner such that it
was certain or substantially certain that emotional distress
would result from the defendant's actions.  Whether a defendant
acted intentionally or recklessly in inflicting emotional
distress is usually a question of fact for the jury.  Travis,
504 S.E.2d at 429.

        The third element is satisfied by showing a "logical
sequence of cause and effect" between the actions of the
defendant and the plaintiff's injury.  Long v. City of Weirton,
214 S.E.2d 832, 848 (W. Va. 1975).  When the defendant's conduct
is "extreme and outrageous" "it is more likely that the severe
emotional distress suffered by the victim was actually caused by
the perpetrator's misconduct rather than by another source."
Travis, 504 S.E.2d at 429 (citation omitted).

        The fourth element requires a showing that the
emotional distress suffered by the plaintiff was so severe that
no reasonable person could be expected to endure it.  Severe
emotional distress includes, inter alia, "such reactions as

                              71

mental suffering and anguish, shock, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." Id. at 430. The finder of fact may consider the intensity and duration of the distress in determining its severity. Id. "Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Id. (quoting Restatement of Torts (Second), § 46, cmt. j (1965)). The reasonableness of the plaintiff's reaction is normally a jury question. Heldreth v. Marrs, 425 S.E.2d 157, 167 (W. Va. 1992).

### (i)  Ms. Bailey

To support the claim of "emotional distress" against defendants Ms. Bailey and the Coalition, the plaintiffs allege that the defendants' conduct was "mean-spirited, racially-motivated and humiliating." ECF No. 1 ¶ 70. The plaintiffs also make broad reference to the "[c]omplaint [being] replete with allegations describing unwarranted conduct that merits" a cause of action. See ECF No. 30 at 6. The plaintiffs describe the conduct by Ms. Bailey and members of the Coalition as "egregious conduct," "humiliating and hate-filled acts," and "venomous actions directed at [Ms. Crawford] . . . in public

places without any pretense of common courtesy." ECF No. 33 at
8.

        The only specific conduct of Ms. Bailey that the
plaintiffs allege in the complaint is that Ms. Bailey
participated in denying the pre-application for a license based
on racial discrimination and that she was "smug" when she
informed Ms. Crawford that there was no appeal process.  See ECF
No. 1 ¶¶ 22, 49, 50.  Conduct that is merely uncivil or mean-
spirited does not constitute outrageous conduct for a valid
claim as an intentional infliction of emotional distress.  See
Courtney, 413 S.E.2d at 423.  The court concludes that the
alleged conduct committed by Ms. Bailey cannot reasonably be
regarded as "extreme and outrageous."  To the extent that Count
8 could be a claim of intentional infliction of emotional
distress, it is dismissed with respect to Ms. Bailey.

        (ii) _The Coalition_

        In addition to the conduct attributed to both Ms.
Bailey and the Coalition, the plaintiffs allege that the
Coalition and its members have "aided and abetted the other
defendants in their discrimination of the plaintiffs." ECF No.
1 ¶ 34.  In particular, the plaintiffs allege that members of
the Coalition spread "rumors and innuendo" about the plaintiffs,

73

depicted DVCC as a "rogue organization," were "verbally and emotionally abusive toward Ms. Crawford at a public event, and were "duplicitous" toward the plaintiffs.  Id. ¶¶ 35, 37, 39, 40.

Like the conduct attributed to Ms. Bailey, the conduct alleged by the Coalition and its members does not rise to the necessary level of outrageousness.  To the extent that Count 8 could be a claim of intentional infliction of emotional distress, it is also dismissed with respect to the Coalition.

### (2) *Negligent Infliction of Emotional Distress*

"'An individual may recover for negligent infliction of emotional distress absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious.'"  Syl. pt. 10, Marlin v. Bill Rich Constr., Inc., 482 S.E.2d 620, 637 (1996) (quoting Syl. pt. 2, Ricottilli v. Summersville Mem'l Hosp., 425 S.E.2d 629 (W. Va. 1992)).  However, "'it is well-established under West Virginia law that, absent a physical injury to the plaintiff, negligent infliction of emotional distress claims may only be maintained in three very limited circumstances'—namely, 'when the plaintiff witnesses a person closely related to [her] suffer critical injury or death as a result of the defendant's

negligent conduct,' 'when the defendant negligently exposed the plaintiff to disease, causing emotional distress based on fear of contracting a disease,' or 'for negligence in mishandling a corpse.'" Daniels v. Wayne Cnty., No. 3:19-0413, 2020 WL 2543298, at *7 (S.D.W. Va. May 19, 2020) (internal quotation marks and brackets omitted) (quoting Frederick v. W. Va. Dep't of Health & Human Servs., No. 2:18-cv-01077, 2019 WL 1198027, at *16 (S.D.W. Va. Feb. 15, 2019); see also Mays v. Marshall Univ. Bd. of Governors, No. 14-0788, 2015 WL 6181508, at *3 (W. Va. Oct. 20, 2015) ("[O]ur law has recognized claims for negligent infliction of emotional distress only in [these three] limited circumstances.").

The plaintiffs' complaint does not allege any of the circumstances that can support a claim for negligent infliction of emotional distress under West Virginia law.  To the extent that Count 8 could be a claim of negligent infliction of emotional distress, it is dismissed.

## V.    Conclusion

For the foregoing reasons, it is ORDERED that:

(1)  Patricia Bailey's motion to dismiss be, and it hereby is, granted in part and denied in part;

(2)  Bill Crouch, DHHR, and the Board's motion to dismiss, be, and it hereby is, granted in part and denied in part; and

(3)  The Coalition's motion to dismiss be, and it hereby is, granted.

In summary, the court dismisses all claims, except for the § 1983 claims against Patricia Bailey and Bill Crouch in their official capacities for violations of the plaintiffs' equal protection rights guaranteed by the Fourteenth Amendment, as set forth in Count 3.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record.

ENTER: October 7, 2020

John T. Copenhaver, Jr.
Senior United States District Judge