UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DOMESTIC VIOLENCE SURVIVORS
SUPPORT GROUP, INC., d/b/a
Domestic Violence Counseling Center, and
ELIZABETH CRAWFORD,

     Plaintiffs,

v.                           Civil Action No. 2:18-cv-00452

BILL E. CROUCH, in his official
Capacity as Secretary of the West
Virginia Department of Health and Human
Resources, and
PATRICIA BAILEY, in her official
capacity as Chairperson of the Family
Protection Services Board, an
entity of the West Virginia Department of
Health and Human Resources,

     Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

        Pending is the motion by the defendants, Bill E.
Crouch and Patricia Bailey, for summary judgment, filed on
February 1, 2021 (ECF No. 67).

I.   Background

        The plaintiffs – Elizabeth Crawford and Domestic
Violence Survivors Support Group, Inc., which does business as
the Domestic Violence Counseling Center (the "Center") –
commenced this action by filing their complaint on March 17,

2018.  <u>See</u> ECF No. 1.  As pertinent to the current motion, the complaint alleges the following.  Ms. Crawford is an African-American woman who founded and serves as the executive director of the Center, a West Virginia non-profit corporation.  <u>See id.</u> ¶¶ 1-2.  The Center and Ms. Crawford provide counseling, education, and prevention services and seminars to domestic violence victims[1] and offenders, with an emphasis on providing services to the African-American community.  <u>See id.</u> ¶¶ 3-4.

Defendant Bill E. Crouch, who is sued only in his official capacity, is currently the Secretary of the West Virginia Department of Health and Human Services ("DHHR").  <u>See id.</u> ¶ 5.  The Family Protection Services Board (the "Board") is a public body under the umbrella of DHHR that oversees the licensing of domestic violence programs in West Virginia.  <u>See</u> W. Va. Code § 48-26-401(b); <u>Men & Women Against Discrimination v. Family Prot. Servs. Bd.</u>, 725 S.E.2d 756, 758 (W. Va. 2011).  The Board is composed of seven board members, one of whom must be the Secretary of DHHR, currently Secretary Crouch, or his designee.  <u>See</u> W. Va. Code § 48-26-301(b)-(c).  Defendant Patricia Bailey, who is sued in her official capacity, is

---

[1] The court acknowledges that there are different preferences for the term to describe individuals who experienced domestic violence.  The court uses "victim" as that is the term used by the plaintiffs in their complaint and briefings.

2

currently the Chairperson of the Board.  See ECF No. 1 ¶ 6.

The Board is mandated to "[r]eceive and consider applications for licensure of domestic violence programs," W. Va. Code § 48-26-401(a)(2), which are to be "compris[ed] [of] both a shelter component and an outreach component," and are "established primarily for the purpose of providing advocacy services . . . to victims of domestic violence [and other crimes] and their children," id. § 48-26-208.  The Board has consistently interpreted the requirement that a licensed domestic violence program have a "shelter component" to mean that a licensure applicant must have a "'physical' shelter." ECF No. 25 at 2; accord ECF No. 27 at 2-3; see also ECF No. 1 ¶¶ 14-20; ECF No. 67-2 ¶¶ 6-8.

On May 18, 2017, Ms. Crawford submitted a pre-application for the Center to be licensed by the Board as a domestic violence program.  See ECF No. 1 ¶ 8; see also W. Va. Code R. § 191-1-5 (2015) (setting forth licensure application process).  In a letter dated July 18, 2017, the Board denied the Center's pre-application on the ground that it failed to satisfy the statutorily required shelter component, which the Board interpreted as requiring the Center to possess a physical shelter.  See ECF No. 1 ¶¶ 11, 14; ECF No. 25 at 2-3.  The plaintiffs allege that the Board deliberately misconstrued the

3

shelter component requirement to mean that the Center needed a physical shelter.  See ECF No. 1 ¶¶ 11-20.   In the plaintiffs' view – with which the court has agreed, see Domestic Violence Survivors Support Grp., Inc. v. Crouch, No. 2:18-cv-00451, 2020 WL 5949897, at *21 (S.D.W. Va. Oct. 7, 2020), the statute does not require licensed programs to have an actual, physical shelter to meet the shelter component requirement, as programs may satisfy the requirement by referring the victims they serve to existing licensed shelters, see EFC No. 1 ¶¶ 15-19.

The plaintiffs allege that denial of the 2017 pre-application was the result of racially-driven animosity and the Board's efforts to "achieve its objective of discriminating against [the Center] and Ms. Crawford on the basis of race." EFC No. 1 ¶ 14.   The Center had previously submitted four pre-applications – in 1996, 2013, 2015, and 2016 – all of which had been denied on the ground that the Center lacked a physical shelter.  See id. ¶¶ 13, 20, 23.  In its 2017 pre-application, the Center claimed that the Board's four prior denials were in fact due to racial discrimination.   See id.

Based on these and related allegations, the plaintiff filed its eight-count complaint against Secretary Crouch, Ms. Bailey, DHHR, the Board, and the West Virginia Coalition Against Domestic Violence, Inc. (the "Coalition"), a non-profit

4

organization that operates licensed domestic violence centers in West Virginia, see id. ¶¶ 5-7, 47-70.  After the defendants filed their motions to dismiss, the court, in a memorandum opinion and order, dismissed all claims except for Count 3 to the extent it is brought against Secretary Crouch and Ms. Bailey in their official capacities.  See Crouch, 2020 WL 5949897, at *25.  In Count 3, the plaintiffs assert, pursuant to 42 U.S.C. § 1983, that Secretary Crouch and Ms. Bailey, acting in their official capacities under color of state law, violated the plaintiffs' Fourteenth Amendment equal protection rights by discriminating against them on the basis of race.  See ECF No. 1 ¶¶ 58-59.

Following the close of discovery, see ECF No. 51,[2] the two remaining defendants, Secretary Crouch and Ms. Bailey, filed the current motion for summary judgment.  The motion has been fully briefed and is ready for disposition.

---

[2] Notably, prior to the close of discovery, which was scheduled for a date prior to the date for the filing of summary-judgment motions, the plaintiffs filed a motion to extend the scheduling order's deadlines in order to provide more time to conduct discovery.  See ECF No. 58.  The next day, however, the plaintiffs filed a motion to withdraw their motion to extend the scheduling order's deadlines, stating that they would "support with their own proof" matters for which they had requested further discovery.  ECF No. 59.  The court subsequently granted the plaintiffs' motion to withdraw their previously submitted motion to extend the scheduling order's deadlines.  See ECF No. 61.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  In deciding a motion for summary judgment, the court must view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party.  See Tolan v. Cotton, 572 U.S. 650, 651, 657 (2014) (per curiam).

The parties moving for summary judgment bear the initial burden of demonstrating the absence of a genuine dispute as to a material fact.  See Young v. Prince George's Cty., 355 F.3d 751, 754 (4th Cir. 2004) (citing Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986)).  When, as here, the plaintiffs, who bear the ultimate burden of proof at trial, are opposing summary judgment, the defendants, as the moving party, may meet their initial burden by showing that the plaintiffs lack evidence to establish one or more of the essential elements of their claim. See Celotex Corp., 477 U.S. at 323.  "Upon such a showing, the

6

burden shifts to the nonmoving part[ies] to 'set forth specific facts showing that there is a genuine issue for trial.'" <u>Young</u>, 355 F.3d at 754 (4th Cir. 2004) (quoting Fed. R. Civ. P. 56(e)). "If the nonmoving part[ies] 'ha[ve] failed to make a sufficient showing on an essential element of [their] case with respect to which [they] ha[ve] the burden of proof,' summary judgment is appropriate." <u>Ballengee v. CBS Broad., Inc.</u>, 968 F.3d 344, 349 (4th Cir. 2020) (brackets omitted) (quoting <u>Celotex Corp.</u>, 477 U.S. at 323).

### III. Discussion

To succeed on a Fourteenth Amendment equal protection claim, plaintiffs must first demonstrate (1) that they have been treated differently from others with whom they are similarly situated and (2) that the unequal treatment was the result of intentional or purposeful discrimination. <u>See</u> <u>Martin v. Duffy</u>, 858 F.3d 239, 252 (4th Cir. 2017) (quoting <u>Morrison v. Garraghty</u>, 239 F.3d 648, 654 (4th Cir. 2001)). "Once the plaintiff[s] make[] this showing, 'the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'" <u>Id.</u> (quoting <u>Morrison</u>, 239 F.3d at 654). State officials' decisions to treat people differently based on a racial classification must satisfy the strict scrutiny standard, <u>i.e.</u>, the classification must be

narrowly tailored to serve a compelling governmental interest.
See <u>Fisher v. Univ. of Tex.</u>, 570 U.S. 297, 307–08 (2013).[3]

A.   <u>Different treatment from those similarly situated</u>

The defendants argue that the plaintiffs have failed
to show that they were treated differently than similarly
situated applicants.  Further, the defendants argue that
evidence they have presented demonstrates that the plaintiffs
were treated no differently than similarly situated applicants.
Specifically, the defendants point to an affidavit submitted by
Nikki Erwin, the Board's coordinator.  See ECF No. 67-2 ¶ 1.
Ms. Erwin states that, since an amendment to the Domestic
Violence Act was enacted in 2013, the Board "has consistently
interpreted [the statute] to mean that a domestic violence
program must possess a physical shelter" and that, "[e]ven prior
to the [2013] amendment," the Board has always required a

_____

[3] To the extent the plaintiffs assert that the strict scrutiny
standard suggests the court should be more solicitous with
respect to the evidence supporting their prima facie case, <u>see</u>
ECF No. 70 at 3, 6, 8, 11, the court notes that the strict
scrutiny standard applies only after the plaintiffs have met
their burden of establishing their prima facie case that the
defendants intentionally treated them differently than similarly
situated applicants because of race, <u>see Martin</u>, 858 F.3d at 252
(explaining that the appropriate level of scrutiny applies "once
<u>the plaintiff[s] make[] [their prima facie] showing</u>" (emphasis
added)).

8

domestic violence program to possess a physical shelter." Id.
¶¶ 6-7.  Based on its interpretation, Ms. Erwin states, the
Board has only once "ever" licensed a domestic violence program
"prior to [its] possessing a physical shelter."  Id. ¶ 8
(emphasis added).  In that singular instance, which occurred
approximately 25 years ago, the program at issue "possessed a
building . . . that was being renovated to be used as a
shelter."  Id.

        The defendants further argue that their interpretation
of the statute, i.e., that it required applicants to have a
physical shelter, was based on the advice of their counsel,
Rocco Fucillo, who instructed them that a physical shelter was
required.  In support of this argument, the defendants point to
Ms. Crawford's deposition testimony.  Ms. Crawford testified
that, in the process of applying for a license in 2008, she sent
a letter to then-Governor Joe Manchin, who "passed it along" to
Mr. Fucillo, "an attorney for DHHR," who told her that she
"needed a residential facility."  ECF No. 67-1 at 5.[4]

---

[4] The defendants also assert that they relied on the advice of
outside legal counsel, Professor Robert Bastress, who, they say,
also opined that the statute required applicants to possess a
physical shelter.  In support of this argument the defendants
cite an allegation in the plaintiffs' complaint that Professor
Bastress "did dispute" the plaintiffs' understanding of the
statute at a July 14, 2017 open meeting.  ECF No. 1 ¶¶ 11-12.
The plaintiffs argue in their summary-judgment briefing,

Based on the evidence presented, the court concludes that the defendants have met their initial burden to show that the plaintiffs lack evidence demonstrating that they were treated differently than similarly situated applicants.  Ms. Erwin's affidavit supports a determination that the Board has only in one instance granted a license to an applicant that lacked a physical shelter in circumstances that are not present here.  Ms. Crawford's deposition testimony further supports a determination that the Board, on advice of counsel, has interpreted the Domestic Violence Act — a statute that the plaintiffs acknowledge is ambiguous on this point, see ECF No. 70 at 7, 9 — to require applicants to possess a physical shelter and that the Board has thus not granted licenses to applicants that, like the Center, lack, and have no plan to possess, a physical shelter.  As the defendants have met their initial

---

however, that Professor Bastress did not dispute their understanding of the statute.  It appears to the court that the confusion regarding Professor Bastress' views stems from a typographical error in the complaint, which appears to have intended to allege that Professor Bastress "did [not] dispute or question Ms. Crawford's argument."  Id. ¶ 12.  The plaintiffs further argue that the Board never retained Professor Bastress as outside legal counsel.  In the court's view, there is little to no evidence in the record regarding Professor Bastress' understanding or advice that supports any party's argument.

However, the plaintiffs appear to concede that Mr. Fucillo was counsel to DHHR, and they do not dispute that he advised the Board that the statute required applicants to possess a physical shelter.  See ECF No. 70 at 12.

burden, the burden shifts to the plaintiffs to demonstrate a genuine dispute that they have been treated differently than similarly situated applicants.

The plaintiffs have failed to present any evidence that they were treated differently than similarly situated applicants.  The plaintiffs' summary-judgment briefing is devoted entirely to discussing purported evidence of race-based animosity toward them, and they present neither evidence nor argument that they were treated differently than any similarly situated applicant.  Indeed, the plaintiffs do not even attempt to identify any other applicant, similarly situated or not, that was either denied or granted a license by the Board.  See Just Puppies, Inc. v. Frosh, 438 F. Supp. 3d 448, 505 (D. Md. 2020) ("[T]he plaintiff[s] must 'identify persons materially identical to [them] who ha[ve] received different treatment.'" (quoting Kolbe v. Hogan, 813 F.3d 160, 185 (4th Cir. 2016), vacated on other grounds, 849 F.3d 114 (4th Cir.  2017) (en banc)); accord Pendelton v. W. Va. Div. of Corr., No. 2:15-01903, 2016 WL 1275055, at *2 (S.D.W. Va. March 31, 2016).  Accordingly, the court concludes that the plaintiffs have failed to meet their burden to demonstrate the existence of a genuine dispute that they were treated differently from similarly situated applicants.

B.   <u>Intentional or purposeful discrimination</u>

The defendants next argue that the plaintiffs have
failed to demonstrate that the Board denied their May 18, 2017
pre-application for a license based on intentional or purposeful
racial discrimination.  Further, the defendants point to
evidence in the record demonstrating that the Board denied the
plaintiffs' 2017 pre-application based on valid reasons
unrelated to race.  Primarily, the defendants rely on evidence,
discussed above, demonstrating that the Board, on advice of
counsel, consistently interpreted the applicable statute to
require applicants to possess a physical shelter and that the
Board denied the plaintiffs' application because they did not
possess a physical shelter.  <u>See, e.g.</u>, ECF No. 67-2 ¶¶ 6-8.
The defendants further rely on Ms. Erwin's affidavit, which
states that the plaintiffs' 2017 pre-application contained
"numerous [other] deficiencies that would prevent the . . .
Center from being granted a license," including that it failed
to "provid[e] adequate budget and financial information,"
"demonstrate a working relationship with community partners,"
and show it could provide "essential services," specifically, "a
24-hour crisis hotline, crisis intervention services, safety
planning services, and . . . temporary emergency shelter."  ECF

No. 67-2 ¶¶ 3, 9; see also id. ¶¶ 10-15, 17-18.[5]

Based on the foregoing evidence, the court concludes that the defendants have met their initial burden to show that the plaintiffs lack evidence demonstrating that their May 18, 2017 pre-application for a license was denied based on intentional or purposeful racial discrimination.  Evidence demonstrating that the Board, on the advice of counsel, has

---

[5] The plaintiffs appear to argue that the court should disregard Ms. Erwin's affidavit to the extent it offers additional reasons for the Board's denial of their pre-application beyond their failure to have a physical shelter.  In this regard, the plaintiffs, citing Ms. Crawford's deposition testimony, assert that the Board did not offer these other reasons for denying the plaintiffs' May 18, 2017 pre-application.  See ECF No. 70 at 6-7 (citing ECF No. 70-1 at 6-7).  A review of the cited testimony, however, does not support the plaintiffs' argument.  When asked "what other grounds has the . . . Board stated for why [the plaintiffs] weren't granted a license," Ms. Crawford testified that, in 2015 or 2017, Ms. Bailey notified the plaintiffs by letter that they were required to have "three of the four" following components: "a safety plan, a crisis intervention [plan]," an "outreach plan," and a physical shelter.  ECF No. 70-1 at 6-7.  Further responding, Ms. Crawford testified that, at the subsequent July 2017 meeting regarding the May 18, 2017 pre-application, Ms. Bailey informed her that she "needed a shelter component."  Id.  It cannot be reasonably inferred from this testimony that the Board limited its reasons for the denial of the May 18, 2017 pre-application to the plaintiffs' failure to possess a physical shelter.  In any event, even if the court agreed with the plaintiffs and disregarded these portions of Ms. Erwin's affidavit, the court would still conclude – based on the evidence that the Board denied the application for the non-discriminatory reason that the plaintiffs lacked a physical shelter – that the defendants have met their initial burden to demonstrate that the plaintiffs lack evidence showing the Board denied their pre-application based on intentional or purposeful racial discrimination.

consistently interpreted the statute to require applicants to possess a physical shelter and that the plaintiffs' pre-application was denied on this basis is sufficient to demonstrate that the pre-application was denied for reasons other than race.  Likewise, evidence, in the form of Ms. Erwin's affidavit, that the plaintiffs' pre-application was otherwise deficient in ways that precluded the Board from granting it adequately demonstrates that the Board had reasons other than race to deny the plaintiffs a license.  Accordingly, the burden shifts to the plaintiffs to demonstrate a genuine dispute that their pre-application was denied because of intentional or purposeful racial discrimination.

To demonstrate intentional or purposeful racial discrimination, the plaintiffs rely heavily on Ms. Crawford's deposition testimony.  They point to the following 13 assertions from Ms. Crawford's testimony:

1.   Sue Julian, who "sat on the [Board],"[6] told Ms.

---

[6] Ms. Erwin asserts in her affidavit that Ms. Julian has never been appointed as a member of the Board and that she only interacts with the Board in her role as a coordinator with the Coalition.  See ECF No. 67-2 ¶ 22.  At her deposition, Ms. Crawford generally asserted that Ms. Julian has a leadership role in the Coalition.  See ECF No. 70-1 at 8; ECF No. 74-2 at 2, 6-7; ECF No. 74-4 at 3.  But, when asked directly about Ms. Julian's relationship with the Board, Ms. Crawford stated that Ms. Julian "sat on the [Board]," sometime between 2012 and 2014.  ECF No. 70-1 at 8; ECF No. 74-4 at 2-3.  The court takes judicial notice that the 2012 and 2015-2016 editions of the West Virginia Blue Book, published by the West Virginia Legislature and available at

14

Crawford in approximately 1995 that Ms. Crawford "was a hoity-toity Negro," ECF No. 70-1 at 8, 11, 13; ECF No. 74-2 at 6-7; ECF No. 74-4 at 1-2;

2.  Que Stephens, an African-American member of the Board, during an open meeting regarding the plaintiffs' pre-application, told Ms. Crawford that he was offended that she was alleging that the Board was discriminating against her based on her race, see EFC No. 70-1 at 12, 14;

3.  Gloria Martin, in 1995, when, Ms. Crawford claims, she was a member of the Board,[7] told Ms. Crawford "there is racism in the [C]oalition" and that the Coalition did not "want an organization led by an African American to be part of the [C]oalition," id. at 5, 11;

4.  An unidentified person with the Coalition and the Board told Carl Chadband, who "worked for an organization called KISRA[8]," "not [to] work with" the

---

http://www.wvlegislature.gov/Educational/publications.cfm, do not include Ms. Julian in their listings of members of the Board for those years. See West Virginia Blue Book 2012 296 (Darrell E. Holmes ed., 2012); See West Virginia Blue Book 2015-2016 304 (Clark S. Barnes ed., 2016); see also id. at III (noting that editions of the West Virginia Blue Book were not published for 2013 and 2014). Viewing the evidence in a light favorable to the plaintiffs, the court must assume for purposes of this motion that Ms. Julian was a member of the Board sometime between 2012 and 2014.

[7] Ms. Erwin asserts in her affidavit that Ms. Martin has never been a member of the Board. See ECF No. 67-2 ¶ 21. Ms. Crawford asserted in her deposition testimony that Ms. Martin was a member of the Board when she made the statement to Ms. Crawford about the Coalition in 1995. See ECF No. 70-1 at 11. The court takes judicial notice that the 1994, 1995, and 1996 editions of the West Virginia Blue Book do not include Ms. Martin in their listings of members of the Board for those years. See West Virginia Blue Book 1994 267 (Darrell E. Holmes ed., 1994); West Virginia Blue Book 1995 283 (Darrell E. Holmes ed., 1995); West Virginia Blue Book 1996 273 (Darrell E. Holmes ed., 1996).

[8] The acronym KISRA probably stands for Kanawha Institute of

15

plaintiffs, and Mr. Chadband relayed this statement to Ms. Crawford, id. at 4;

5.  Vonda Spencer, who "worked for the state," apparently administering "the TANF[9] program," told one of Ms. Crawford's unidentified former clients that, if the client continued to see Ms. Crawford, the client would stop receiving aid from the Bureau for Children and Families, and the client relayed this statement to Ms. Crawford in 2006, id. at 5;

6.  Judy King, "who was [a] past chairperson of the [Board]," told an unidentified woman that Ms. Crawford was "unqualified," and the unidentified woman relayed this statement to Nancy Kemp, who then relayed it to Ms. Crawford, id. at 8;

7.  Ms. Julian told an unidentified group of people in 1995 that Ms. Crawford was "unqualified," and Tom Smith relayed this statement to Ms. Crawford, id.; ECF No. 74-2 at 6;

8.  Jim Cooper, the former "Director of Programs for OHFLAC[10]," a "part of DHHR," told Patty Hill that Ms. Crawford was "unqualified to have an OHFLAC license," ECF No. 70-1 at 9;

9.  Carrie Webster, who "sat on the[] board of directors" for the "YWCA Resolve Family Abuse Program," told Reverend James Ehly that Ms. Crawford "was not educated enough," id.;

10.  Nicole Reed, "with the Crime Victims Compensation Fund," told Ms. Crawford that "we don't want you around" and "threatened to throw [Ms. Crawford] out of the Capitol," id. at 10;

11.  Caroline Carte, a "victim's advocate in the

---

Social Research and Action.

[9] The acronym TANF probably stands for Temporary Assistance to Needy Families.

[10] The acronym OHFLAC probably stands for the Office of Health Facility Licensure and Certification, an agency housed under DHHR.

prosecutor's office," told Ms. Crawford that "we don't want you around," id.;

12. GeorgeAnn Grubb, former "director of the YWCA Resolve Family Abuse Program," told George Robertson, a "colleague of [Ms. Crawford]," that the Center was a "rogue domestic violence program," id. at 13;

13. Unidentified people with "the YWCA" contacted Becky Ceperly, the former "CEO of Greater Kanawha [Valley] Foundation," after noting that the Foundation had awarded a grant to the Center, and told Ms. Ceperly "not to help [Ms. Crawford]" and "not to fund the [Center] again," and Tom Smith relayed this statement to Ms. Crawford, ECF No. 74-3 at 7; ECF No. 74-4 at 10.

Although the plaintiffs concede that only a few of the individuals discussed in the foregoing testimony "have or have had a direct affiliation with" the Board, they argue that nearly all of them belong to "a 'domestic violence prevention community'" — "an intertwined and collective, tightly-knit group of individuals, a 'clique,' interfacing intermittently with one another as well as with various entities and organizations including [the Board]." ECF No. 70 at 3 (quoting ECF No. 70-1 at 8-9).

With respect to the above statements recounted in Ms. Crawford's testimony, the defendants raise several arguments. First, the defendants argue that many of the statements contain hearsay and thus should be disregarded for purposes of deciding the current summary-judgment motion. In response, the plaintiffs do not seriously dispute that many of the statements

from Ms. Crawford's testimony listed above are inadmissible hearsay.[11]  Indeed, 8 of the 13 statements (Nos. 4, 5, 6, 7, 8, 9, 12, and 13) involve double hearsay.  The plaintiffs nevertheless appear to argue that they could present the statements at trial in an admissible form by calling as witnesses individuals identified in Ms. Crawford's testimony "who can testify to witnessing [the] racially discriminatory conduct and others who have actually engaged in such conduct." ECF No. 70 at 10.  The plaintiffs point out that, in their initial Fed. R. Civ. P. 26(a)(1) disclosures, they listed, as potential witnesses, some of the individuals identified in Ms. Crawford's testimony, including Carl Chadband, GeorgeAnn Grubb, Nicole Reed, Caroline Carte, Vonda Spencer, Gloria Martin, Sue

---

[11] The plaintiffs appear to argue in passing that Ms. Crawford's deposition testimony is not hearsay and does not contain hearsay because "Ms. Crawford herself testified at length about racial discrimination she has personally experienced from the defendants or those affiliated with them."  ECF No. 70 at 10. To the extent the plaintiffs argue the fact that Ms. Crawford testified at a deposition as to statements made by other individuals alone renders the statements non-hearsay, they are mistaken.  See Fed. R. Evid. 801.  To the extent the plaintiffs argue that all 13 statements do not constitute hearsay because they were made by a party-opponent, Ms. Crawford's own deposition testimony demonstrates that most of the statements are alleged to be made by individuals with no affiliation with the Board or DHHR at the time the statements were made.  The court has no obligation to determine which, if any, of the 13 statements the plaintiffs claim would not be hearsay based on this vague, one-sentence argument in their briefing.

Julian, Carrie Webster, and Judy King.  <u>See</u> ECF No. 70-3.[12]

When a party at the summary-judgment stage asserts
that a fact is genuinely disputed based on materials that
themselves would not be admissible at trial, "the court may
consider . . . the content or substance of [the] otherwise
inadmissible materials where . . . 'the party submitting the
evidence shows that it will be possible to put the information
into an admissible form.'"  <u>Humphreys & Partners Architects,</u>
<u>L.P. v. Lessard Design, Inc.</u>, 790 F.3d 532, 538 (4th Cir. 2015)
(internal brackets and ellipsis omitted) (quoting 11 James Wm.
Moore et al., <u>Moore's Federal Practice</u> § 56.91[2] (3d ed.
2015)).  "If [a party] objects to the court's consideration of
'material cited to support or dispute a fact,' the [proponent]
has the burden 'to . . . explain the admissible form that is
anticipated.'"  <u>Id.</u> at 538-39 (internal citations omitted)
(quoting Fed. R. Civ. P. 56(c)(2) and advisory committee's note
to 2010 amendments).  The plaintiffs assert that the contents of
the 13 statements could be presented in admissible testimony at
trial from witnesses who are alleged to have either made or

---

[12] The court notes that two individuals, Nicole Reed and Caroline
Carte, identified in two of the statements (Nos. 10 and 11) —
are alleged to be with the Crime Victim's Compensation Fund and
the prosecutor's office, respectively, neither of which is
attached to the Board.

heard the statements at issue.  The plaintiffs have the burden to demonstrate that such testimony would be admissible, including that it would not be subject to the rule against hearsay.

The plaintiffs have not met their burden.  As an initial matter, they have not offered any explanation as to the form of any of the testimony they anticipate they will elicit or how that testimony will be admissible.  See Sweet People Apparel, Inc. v. Phoenix Fibers, Inc., 748 F. App'x 123, 124 (9th Cir. 2019) ("Because [the proponent] failed to . . . explain the admissibility of its proffered evidence, the district court did not abuse its discretion in excluding [it] from its consideration of [the] motion for summary judgment." (internal citation omitted)); accord Brown v. Perez, 835 F.3d 1223, 1232-33 (10th Cir. 2016).  The plaintiffs likewise fail to offer any explanation how testimony from any of these witnesses as to the numbered statements above would be exempted from the definition of hearsay or would fall under an exception to the rule against hearsay.  See Ford v. Hooks, No. 1:19cv444, 2020 WL 6784503, at *10-11 (M.D.N.C. Nov. 18, 2020) (declining to consider statements when the proponent failed to explain how the statements, if presented through trial testimony, would not be subject to the rule against hearsay).

20

More importantly, the plaintiffs do not explain which of the potential witnesses they identify will be available to testify at trial, nor do they offer any indication — through affidavit, deposition, or otherwise — of the testimony these potential witnesses are expected to provide.[13]  See Am. Home Assur. Co. v. Greater Omaha Packing Co., Inc., 819 F.3d 417, 429-30 (8th Cir. 2016) (agreeing with the district court that the proponent "failed to show how [a reporter's] article and emails might be reduced to an admissible form at trial," when "[a]lthough [the proponent] had mentioned that it might call the reporter as a witness," the reporter's newspaper "had not

---

[13] In their proposed pretrial order, submitted after the completion of summary-judgment briefing, the plaintiffs state that they intend to call Ms. Crawford to testify at trial as well as "certain of" the 22 other friendly witnesses listed in their Rule 26(a)(1) initial disclosure, which includes George Robertson and Carl Chadband.  ECF No. 80 at 1; see ECF No. 70-3 at 1-3.  However, the plaintiffs state that they will not call anyone from the list of adverse witnesses provided in their initial disclosure to testify at trial, a list which includes GeorgeAnn Grubb, Nicole Reed, Caroline Carte, Vonda Spencer, Gloria Martin, Sue Julian, Carrie Webster, and Judy King.  See ECF No. 80 at 1-2; ECF No. 70-3 at 4-5.  The defendants' proposed pretrial order does not list any of these individuals as witnesses they intend to call to testify at trial.  See ECF No. 80 at 2-3.  No party identifies Jim Cooper, Patty Hill, Tom Smith, Reverend James Ehly, or Becky Ceperly as potential witnesses at trial.  See ECF No. 80.  Thus, not only have the plaintiffs failed to explain how they plan to elicit testimony at trial from the individuals alleged to have made or heard the listed statements, but they also appear to have affirmatively planned to not elicit any testimony from individuals, aside from Ms. Crawford, alleged to have made or heard 10 of the 13 statements (Nos. 1, 2, 5, 6, 7, 8, 9, 10, 11, and 13).

responded to a subpoena and [the proponent] had neither deposed the reporter nor obtained an affidavit as to what the reporter might testify to at trial"); 11 James Wm. Moore, Moore's Federal Practice § 56.91[3A] (3d ed. 2021) ("[T]he [proponent's] failure to secure sworn statements at the summary-judgment stage – or to confirm that the witnesses can and will testify as expected later – can significantly undercut the claim that [hearsay] statements actually can be presented in an admissible form at trial."). The court emphasizes in this regard that the plaintiffs, despite having the ultimate burden to demonstrate intentional or purposeful discrimination, appear to have engaged in no discovery to ascertain the likely testimony of the individuals referenced in Ms. Crawford's testimony. See Greater Omaha Packing Co., Inc., 819 F.3d at 429-30; Moore's Federal Practice § 56.91[3A]. Because the plaintiffs have not met their burden, the court concludes that all but the first three of the numbered statements (Nos. 1, 2, and 3) need not be considered by the court in deciding the current motion.

    With the exception of the first three, none of the numbered statements, on their face, concern race, and it is not reasonable to infer from them that the defendants discriminated against the plaintiffs based on race in denying the 2017 pre-

application.[14]  In the second statement, Mr. Stephens, an
African-American member of the Board, is said to have stated
that he was offended at the Board's being accused of racial
discrimination.  It is not reasonable to infer from this
statement that he, the Board, or anyone else intentionally or
purposefully discriminated against the plaintiffs.  In the third
statement, Ms. Martin, who does not appear to have been a member
of the Board at the time, is said to have stated, in 1995, that
there was racism in the Coalition and that the Coalition did not
want an African-American-led organization to be part of the
Coalition.  This may be evidence of racially discriminatory
intent or purpose on the part of the Coalition in 1995, but it
is not reasonable to infer from such evidence that any member of
the Board or DHHR employees – intentionally or purposefully
discriminated against the plaintiffs based on race in denying
their 2017 pre-application.[15]

---

[14] Aside from Ms. Crawford, the only individuals that the
plaintiffs have indicated they might call to testify at trial
regarding some of the 13 statements are Carl Chadband and George
Robertson.  See ECF No. 80 at 1; ECF No. 70-3 at 1-3.  The court
notes that both Mr. Chadband and Mr. Robertson would be called
upon to testify regarding statements that, on their face, do not
concern race, the Board, or DHHR, and one of which is said to
have been made by an individual whom the plaintiffs have not
identified on the record.

[15] The court notes that the evidence cited by the plaintiffs
concerning intentional or purposeful racial discrimination by
the Coalition is limited to Ms. Martin's 1995 statement (No. 3)

In the first statement, Ms. Julian is said to have called Ms. Crawford "a hoity-toity Negro," as well as "unqualified," in approximately 1995, at least 17 years before the plaintiffs' questionable claim that she served as a member of the Board sometime between 2012 and 2014, which "service" would have ended three years before the plaintiffs' 2017 pre-application was denied.  Although the statement, if uttered, evidences purposeful or intentional racial discrimination against the plaintiffs by Ms. Julian, it is unreasonable to infer from it alone that the defendants' decision to deny the plaintiffs' pre-application 22 years later was the result of, or was influenced by, purposeful or intentional racial discrimination.  See NAACP v. U.S. Dep't of Homeland Sec., 364 F. Supp. 3d 568, 577 (D. Md. 2019) (explaining that racial animus exhibited in statements by non-decisionmaker may demonstrate equal-protection violation if there is evidence that the non-decisionmaker influenced or manipulated the decision-making process); accord CASA de Md., Inc. v. Trump, 355 F. Supp. 3d 307, 325-26 (D. Md. 2018).  Even if it were assumed that the statement might have some bearing on the Board's motivations in

---

and the statement made by an unidentified individual alleged to be affiliated in some unexplained way with the Coalition to Carl Chadband, telling him not to work with the plaintiffs (No. 4), a statement that, on its face, does not concern race or indicate intentional or purposeful racial discrimination.

2017, the court concludes that it amounts to nothing more than a scintilla of evidence on the issue of purposeful or intentional racial discrimination.  <u>See</u> <u>Wai Man Tom v. Hosp. Ventures LLC</u>, 980 F.3d 1027, 1037, 1043 (4th Cir. 2020).

Lastly, the defendants argue that, to the extent plaintiffs rely on the statements made by individuals not affiliated with the Board or DHHR to demonstrate purposeful or intentional discrimination in the decision to deny the plaintiffs' 2017 pre-application, the plaintiffs have failed to demonstrate that the statements or conduct of those individuals should be attributed to the defendants.  The court agrees.

The plaintiffs' burden at this stage includes providing the court with "a coherent legal theory as to how [they] will recover at trial." <u>Davis v. Complete Auto Recovery Servs., Inc.</u>, No. JKB-16-3079, 2020 WL 4041128, at *5 (D. Md. July 17, 2020); <u>Wilson v. C.R. Bard, Inc.</u>, No. 5:19-cv-00567-M, 2020 WL 2574652, at *7 (E.D.N.C. May 21, 2020) ("As the nonmovant on summary judgment, . . . [the] [p]laintiff[s] bear[] the burden[] of arguing a viable theory of liability . . . [because] [the] [p]laintiff[s'] arguments and forecast of evidence determine whether a dispute regarding [material] facts is genuine such that a trial is necessary.").  Under this burden, it is the obligation of the plaintiffs, not the court,

to assert a coherent legal theory, develop that theory through argument, and support it with citation to relevant legal authority.  See Penley v. McDowell Cnty. Bd. of Educ., 876 F.3d 646, 661 (4th Cir. 2017) ("[C]ourts are not obligated to do the work of the litigants[.]"); accord Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985); see also Clayton v. Nationwide Mut. Inc. Co., 260 F. Supp. 3d 514, 521 (D.S.C. 2017) ("The court has no obligation to fashion arguments for a party or to further develop a party's argument when it is wholly conclusory, unexplained, and unadorned with citation to legal authority.").  Thus, here, the plaintiffs have the burden of asserting, developing, and supporting with citation to legal authority, a legal theory under which the statements or conduct of individuals not employed by the Board or DHHR at or near the time the plaintiffs' 2017 pre-application was denied may nonetheless be attributed to the Board or DHHR so as to demonstrate that the defendants purposefully or intentionally discriminated against the plaintiffs based on race.

The plaintiffs have not met this burden.  Although the plaintiffs assert that the "domestic violence prevention community" is an intertwined clique, they have not explained how the community's "cliquishness" permits a court to attribute to the defendants statements made and actions taken over the course

of nearly 30 years by other individuals, unconnected to the ultimate decision that is the subject of this case.  Nor do the plaintiffs cite legal authority or otherwise attempt to develop a coherent legal theory that would allow such attribution. Indeed, the plaintiffs candidly state that the court should consider their evidence of "subtle" racial discrimination perpetrated by the community even though they "lack[] specific legal authority" to support the argument.  ECF No. 70 at 8. But, as the court has explained above, developing a legal theory that imposes liability on the defendants is the plaintiffs' burden, not the court's.  In these circumstances, the plaintiffs have failed to demonstrate the existence of a genuine dispute, and summary judgment is appropriate.  See Wilson, 2020 WL 2574652, at *7 ("Where after reviewing the nonmovant[s'] forecast the court must consider theories of liability that were not argued . . . , the nonmovants ha[ve] failed to demonstrate a genuine dispute as to a material fact and summary judgment in the movant[s'] favor is appropriate.").

*          *          *

In sum, in addition to failing to demonstrate a genuine dispute that they were treated differently than any similarly situated applicant, the plaintiffs have also failed to show a genuine dispute that the defendants' decision to deny

their 2017 pre-application resulted from purposeful or
intentional racial discrimination.

### IV.   Conclusion

For the foregoing reasons, it is ORDERED that the
defendants' motion for summary judgment (ECF No. 67) be, and
hereby it is, granted.  It is further ORDERED that Count 3 of
the complaint against Ms. Bailey and Secretary Crouch in their
individual capacities be, and hereby it is, dismissed.

The Clerk is directed to transmit copies of this order
to counsel of record and any unrepresented parties.

ENTER: March 18, 2021

John T. Copenhaver, Jr.
Senior United States District Judge